**Gordon LENZ, individually and on behalf of Naples Tennis Resort, Ltd.,**
Plaintiff,

v.

**ASSOCIATED INNS AND RESTAURANTS COMPANY OF AMERICA, Aircoa Equity Interests Inc., TFC Investments Ltd., Realvest Inc., formerly known as Fracorp, Inc., Defendants.**

90 Civ. 3026 (KC).

United States District Court,
S.D. New York.

Sept. 24, 1993.

Jay Edmond Russ, Russ & Russ, Massapequa, NY, for plaintiff.

Michael Davies, Coudert Brothers, New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

This case involves a tax shelter that never stopped losing money. In the late 1970's and early 1980's, the United States experienced a rapid proliferation of real estate limited partnerships designed to shelter taxable income. These tax shelters constituted one stimulus for the Congressional overhaul of the federal tax laws in 1986, and reform significantly limited their appeal. The legal fallout from these shelters, however, continues to be felt at every level of the nation's adjudicative fora. Accusations of fraud and mismanagement have proven rampant where real estate tax shelters are concerned. Such an allegation is before the court in this case.

## BACKGROUND

### A. The Sale

In 1981, Gordon Lenz owned Conference Associates, an insurance company in Patchogue, New York specializing in health and other personal insurance plans for trade or professional associations, and in property and casualty insurance for businesses. His income had exceeded six figures for over five years, and in that time he had purchased several real estate investments, including two small apartment houses and a small office building. Lenz was in the 50% tax bracket and unhappy about it.

Lenz's discontent with his tax burden led him to respond enthusiastically to a call in March 1981 from his friend, Mark Rose, in which Rose stated that he had a golden opportunity for Lenz to shelter some of his income in a Florida real estate investment.

In fact, Lenz was so enamored at the prospect that he left within the hour to examine the property with Rose. Based on his conversations with Rose by phone and then on the airplane, Lenz understood the investment to involve participation in a limited partnership formed to purchase a tennis club in Naples, Florida. He further understood that the driving force behind the investment was Frates Corporation, an organization in which Rose had indicated to Lenz that he (Rose) was a partner.

■ Upon their arrival in Naples, Lenz and Rose were met by Charles Holmes, who, Lenz was led to believe, represented the general partners of the project. Holmes then conducted a tour of both the Naples Bath and Tennis Club ("NBTC"), the assets of which were to constitute the assets of the limited partnership, and an adjacent condominium project. According to Lenz,[1] Holmes offered a detailed description of the structure and administration of the limited partnership. Specifically, Holmes stated that the limited partnership would purchase NBTC for approximately $5,000,000 and the project was expected to lose money for two or three years, offering Lenz a writeoff of two times his annual investment during that time. The resort would begin to generate profits in the third year of operation and distributions of these profits would ultimately permit each limited partner to receive a cash return on their investment at or near the amount of his contribution prior to sale of the resort. These distributions were guaranteed, according to Holmes, to reach an annual rate of 10% of each limited partner's investment, and projected to rise as high as 15%. Holmes further indicated that the sale of the assets of the limited partnership for a profit was also guaranteed because a contract existed with the adjacent condominium association to purchase the project for $8,000,000 within any of the next five years and $11,000,000 during the sixth year or any year

thereafter. Lenz was repeatedly told that the investment offered him a guaranteed "win-win" outcome (i.e., he could both shelter income through initial losses and gain a return on his investment through cash distributions and sale of the resort.) At the time of the tour, Lenz did not ask for or receive any financial or legal documents verifying Holmes's representations.

During the course of Lenz's overnight stay in Naples, Holmes suggested to Lenz that he could spread his investment over five years, contributing $50,000 in each year. Lenz indicated that this option represented an attractive income sheltering strategy for him. In response to his expression of interest, he received one week later the subscription agreement ("Subscription Agreement"), the signature page to the partnership agreement ("Partnership Agreement"), and a partnership summary ("Summary") for Naples Tennis Resort, Ltd. ("NTR" or "the Limited Partnership").

Lenz did not have expert advisors, attorney or accountants, review the documents. He himself reviewed the Subscription Agreement and the accounting projections contained in the Summary, which projected that the Limited Partnership would produce profits in its third year after providing initial tax shelter benefits. By signing the Subscription and Partnership Agreements on April 1, 1981, Lenz committed to purchase a 22.27% limited partnership interest in NTR for the sum of $245,000, comprised of $25,000 in cash and a $220,000 promissory note payable to NTR. The other limited partners were Mark Rose and M & R Equipment (a company controlled by Rose) owning together a 71.28% interest, and Kevin Bowler, who purchased a 4.45% interest.

**B. The Subscription and Partnership Agreements**

In signing the Subscription and Partnership Agreements, Lenz warranted that he

---

**1.** In his deposition, Holmes testified that he did not recall giving the tour to Lenz, nor any of the representations allegedly made during it. While mindful of the duty not to resolve disputed issues of fact on summary judgement, the court must resolve ambiguities and draw reasonable inferences against the moving party. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Accordingly, the court assumes *arguendo* the truth of plaintiff's factual allegations, outlined below, regarding the oral representations made to him.

understood: 1) The Limited Partnership constituted a risky and speculative enterprise; 2) He could withstand complete loss of his investment; 3) He and/or his advisors had sufficient investment sophistication to evaluate the merits of the project and had received all information necessary to do so; 4) He had not relied upon any assurances regarding the tax benefits of the investment or projections of its future profitability; 5) The sale of the project could yield significant tax liabilities; and 6) The other real estate activities of the general partners could lead to conflicts of interest with transactions involving the Limited Partnership. *See,* Subscription Agreement, §§ 4, 5; *see also,* XVI of the Partnership Agreement.[2]

Section 12.2 of the Partnership Agreement ceded to the General Partners "full, exclusive and complete discretion in the management and control of the affairs of the Partnership." This discretion included, among other powers, the capacity to enter into mortgages, borrow money, enter into leases, commit to and pay management fees, and sell all of the partnership's property at any price deemed satisfactory to the General Partners.

The Partnership Agreement also obligated the General Partners to certain procedures in distributing net proceeds from extraordinary events and making information available to the limited partners. Specifically, § 8.3 stated that:

All net proceeds received by the Partnership from extraordinary events (i.e., the net proceeds from any indebtedness, refinancing, sale . . . or other disposition of all or any substantial part of the Partnership's property) . . . shall be distributed in the following order:

(a) To the payment of all debts., liabilities, or obligations of the Partnership, other than in respect to those set forth in (b) through (f) below;

(b) Then, to the setting up of any reserves which the General Partners deem reasonably necessary to provide for all contingent or unforeseen liabilities . . .

(d) Then, pro rata 1% to each of the General Partners and 98% to the Limited Partners in proportion to their respective Partnership Interests, until such time as 100% of the cash capital contribution of all Partners are returned . . .

(f) Thereafter, pro rata 25% to each of the General Partners and 50% to the Limited Partners in Proportion to their respective Partnership interests.

Section 10 of the Partnership Agreement provided that the books and records of the Limited Partnership would be available for review, that each partner would be furnished with annual reports and tax information, and that any other information requested by a limited partner as to the partnership and its activities, would be provided to such limited partner.

Both the Subscription and Partnership Agreements provided that the Limited Partnership was to be governed by Oklahoma law.

## C. Structure and Operation of the Limited Partnership

The original general partners of the Limited Partnership ("General Partners") were TFC Investments, Ltd. ("TFC") and Associated Inns and Restaurants Company of America ("Associated Inns"). In July 1984, Associated Inns' general partnership interest was transferred, by consent of all general and limited partners, to Aircoa Equity Interests, Inc. ("AEI"). Associated Inns later merged with another corporation, and the surviving entity was renamed Aircoa Hospitality Services, Inc. ("AHS").

---

**2.** Paragraph XVI provides:

*Investment Representations*

. . . Further, by execution of this Agreement or any amendment hereto, each party represents that he has made such independent investigation and analysis of the Partnership and its affairs and the other Partners as he deems necessary to make a decision to participate in the Partnership and be bound by the terms and provisions of this Agreement or any amendment hereto. Specifically, without limiting the generality of the foregoing, each party to this agreement understands his investment is speculative, involves substantial risks, results in substantial compensation to the General Partners and their affiliates, and involves potential conflicts of interest between the Partnership and the General Partners and their affiliates.

The Limited Partnership acquired NBTC from a company affiliated with the general partners in a sale/leaseback transaction. The purchase price was $5 million, which included a 10% mortgage which "wrapped" an existing $3 million first mortgage on the property. Under the leaseback arrangement, the Limited Partnership leased the property back to the seller for an annual base rent of $480,000. The rental amount approximated the annual rent to be paid by the Limited Partnership on the $5 million mortgage. In addition, the Limited Partnership was to receive 90% of the tennis club's annual net profits before income taxes.

The Partnership Agreement also provided for various management fees and expenses, including: 1) 4% of gross revenues to general partner Associated Inns (later Aircoa) to manage the club facilities; 2) $25,000 per year to Frates Corporation for administrative, accounting, and other administrative supervision of the Partnership's affairs; and 3) An equity placement fee equal to 6% of the Limited Partners' capital contributions to Asset Management, Inc., a company affiliated with the General Partners.

## D. The Financial History of the Limited Partnership

As one might deduce from the existence of this litigation, the Limited Partnership never turned the corner to profitability. NTR operated at a loss from 1981 through 1989.[3] The project was hampered by heavy local competition from other resorts and such inherent limitations on the revenue generating potential of a tennis club as the number of courts available and court time allocable in a single day.

During this period, the General Partners entered into several significant transactions affecting the Limited Partnership. First, on October 2, 1986, the lease agreement was extended for a period of seven years under the same rental terms. Second, general partner Aircoa Equity, on behalf of the Limited Partnership, modified between 1986–1988 the original mortgage that the Limited Partnership had assumed upon its purchase of NBTC. In October 1986, the General Partners refinanced the original mortgage, with a new mortgage issued in favor of Citizens and Southern National Bank of Collier County ("C & S") for $2.95 million. Proceeds of the refinancing were used to repay the original mortgage, fund closing costs, purchase furniture, fixtures, and equipment, and provide working capital for the tennis club. In September 1987 the General Partners obtained an additional C & S issued and a $300,000 credit line from C & S, the proceeds of which were used to construct additional tennis facilities as NBTR. Lenz was not notified of the above transactions nor did he receive any distributions as a result of their occurrence.

In early 1988, the General Partners decided to sell NBTC and began sales efforts which lasted for just under two years. On December 4, 1989, the property was sold for $2,814,776. The purchase price was insufficient to cover all debt on the property; therefore, an affiliate of AEI paid off $245,000 of NTR debt to enable the sale to proceed. Lenz and other limited partners were notified of the sale within ten days. As a result of the sale, Lenz was required to declare $502,000 in "phantom income" for the 1989 tax year, thereby incurring tax liability in the amount of $179,975.

## E. Plaintiff's Relationship With The General Partners

Relations between Lenz and the General Partners soured rapidly after his initial investment in the Limited Partnership. In 1981 and 1982, the General Partners were late in sending Lenz the K–1 tax forms necessary for filing his income tax returns. Lenz, moreover, had begun to deal with other real estate limited partnerships[4] and his

---

**3.** The yearly partnership loss attributable to Lenz's stake in the Limited Partnership averaged over $100,000. These tax losses significantly reduced his income tax burden. Despite maintaining a six-figure income throughout the period in question, Lenz paid no more than 33% of his income in taxes in any single year, and paid no income tax at all in 1981 and 1982.

**4.** In the years between 1981 and 1989, invested in four limited partnerships other than NTR and two general partnerships. In 1984, he became a

experiences led him to believe that the General Partnership had not provided him with the proper documentation for his investment (e.g., he had been given no offering memoranda). After significant difficulty in obtaining responses to his inquiries, Lenz managed to obtain from David Rose, an employee of Fracorp, a variety of documents concerning NTR, including the full text of the Partnership Agreement.

These documents failed to reassure Lenz regarding NTR. By 1984, the Limited Partnership had begun to lose money beyond the point at which it was originally projected to become profitable. Lenz began persistently questioning David Rose as to when the project would start to turn a profit. On October 26, 1984, Rose forwarded to Lenz a letter stating that the Limited Partnership was projected to continue losing money at least through 1986. At this point, Lenz was so dissatisfied with his investment that he consulted with Martin Licht, Esq., an attorney specializing in tax shelter litigation, but chose not to pursue legal action at the time.

On November 13, 1984, Lenz wrote a scathing letter to Rose, demanding further information regarding when the Limited Partnership would become profitable because Holmes had initially represented that NTR constituted a conservative investment with absolute safety of principle and a guaranteed 10% annual rate of return. Lenz also requested to know when the General Partners intended to sell NTR at the profit that Holmes had guaranteed. David Rose's response, dated February 7, 1985, reiterated the loss projections contained in his previous missive, and further stated:

> While we expect that a future appraisal will yield a sales price in excess of our $5,000,000 basis, we won't know that until 1987 when the actual results of our operations for 1986 are complete. Therefore, any specific projection of net sales results at this time would be speculative at best. (emphasis added)

general partner of a limited partnership tax shelter, and participated in marketing its limited partnership interests.

Upon reviewing financial statements of NTR which accompanied Rose's February 7 letter, Lenz suspected that the General Partners were intentionally generating losses through NTR:

> I guess [the financial statements] also represented if in fact the business was collecting $480,000 in rent and it had a loss at the end of the year, that it wasn't running itself in a way that businesses normally do, trying to produce a profit, so that they [could] pay me the money that they promised to pay me when I first went in.

Lenz deposition p. 303. Despite this suspicion, and the fact that by December 1985 he had become "very disenchanted with the investment as a whole," *Id.*, p. 361 Lenz largely ceased further communication with the General Partners or other action concerning NTR until after the Limited Partnership's sale in December 1989. In March 1986, Lenz received an excerpt from an article in the New York Times depicting the conviction of Holmes for fraud in Tulsa, but did not choose to contact the General Partners in response to it. In fact, after a series of phone calls on one day in late 1986 or early 1987,[5] Lenz had no more contact at all with the General Partners' representatives, aside from the periodic tax/financial information he received from the Limited Partnership.

In May 1990, Lenz initiated this lawsuit.

## F. Procedural History of This Action

Plaintiff's complaint contains both federal and state claims for relief. In substance, Lenz contends that the defendant General Partners defrauded him in his 1981 purchase of his limited partnership interest by intentionally misrepresenting the security and future profitability of the investment. The defendants' intent from the outset, according to plaintiff, was to milk the resources of the Limited Partnership for the benefit of defendants' other projects, particularly the condominium association adjacent to NBTC. This systematic looting is alleged to have in fact taken place throughout the duration of plaintiff's investment. It included the lease ex-

5. Lenz could not recall the exact date. (Lenz Dep. at 338–340.)

tension and mortgage modifications described above, which plaintiff alleges did or should have generated proceeds to be distributed to the limited partners pursuant to the Partnership Agreement.

Formally, plaintiff has alleged violation of Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), and Rule 10(b)(5) promulgated thereunder. Plaintiff also asserts claims of breach of fiduciary duty, conversion, negligence, and a demand for an accounting under Oklahoma law. He sues both in his individual capacity and derivatively on behalf of the Limited Partnership.

By order dated November 14, 1991, the court held defendants TFC and Realvest in default for having failed to obtain counsel, and barred them from participating in the action in any way. The complaint, however, appeared to assert that all defendants were jointly liable; therefore, Lenz's motion for a default judgement against TFC and Realvest was denied.

Defendants have moved for summary judgement, arguing *inter alia* that plaintiff's federal securities law claims are time-barred and the court lacks supplemental or diversity jurisdiction over the state law claims. Plaintiff has cross-moved for partial summary judgement granting an accounting. For the reasons set forth below, the court grants defendants' motion and denies plaintiff's cross-motion.

### LEGAL DISCUSSION

#### Federal Securities Law Claims

**A. The Appropriate Statute of Limitations for the 10(b) and Rule 10(b)–5 Actions**

Lenz commenced his § 10(b) action in May 1990. Section 27A of the Securities Exchange Act of 1934 provides:

(a) Effect on Pending Causes of Action.— The limitation period for any private civil cause of action implied under Section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitations period provided by the laws applicable in the jurisdiction, including principles

of retroactivity, as such laws existed on June 19, 1991.

The applicable law in this Circuit on June 19, 1991 was contained in the Court of Appeals' decision *Ceres Partners v. Gel Assoc.,* 918 F.2d 349 (2d Cir.1990), which held that § 10(b) claims must be brought no later than one year from discovery of wrongdoing and in any event no later than three years after the wrongdoing (the "one year/three year rule"). *Ceres,* however, was not decided until December 1990, six months after plaintiff filed this case; therefore, the *Ceres* rule would apply to plaintiff's complaint only if the court were to apply *Ceres* retroactively.

The court need not reach the question of the retroactivity of *Ceres* in this case. The Court of Appeals has stated explicitly that there is "no need to analyze [the] applicability of *Ceres* if [the] claim would also have been barred under the pre-*Ceres* rule." *Burke v. Jacoby,* 981 F.2d 1372, 1377 (2d Cir.1992); *Grondahl v. Merritt & Harris,* 964 F.2d 1290, 1292–93 (2d Cir.1992). Plaintiff's claim in the instant case is time-barred under the law as it stood prior to *Ceres.*

Prior to Ceres, a Rule 10b–5 action that accrued in New York and was brought in a district court within New York was time-barred in this Circuit if not brought "within six years from the time the cause of action accrued or within two years from the time the wrongdoing was, or with reasonable diligence should have been, discovered." [6] *Armstrong v. McAlpin,* 699 F.2d 79, 87 (2d Cir. 1983); see also *Stull v. Bayard,* 561 F.2d 429, 431–32 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978).

**1. Applying the Six Year/Two Year Limitations Period to This Action**

■ Although state law controls the limitations period, the date the statute begins to run is determined by federal common law. *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); *Cullen v. Margiotta,* 811 F.2d 698, 725 (2d Cir.), cert. denied, *Nassau County Republican Committee,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).

**6.** The court will subsequently refer to this limitations period as the "six year/two year" rule.

■ In this Circuit, the six year prong of this limitations period runs from the time that a plaintiff actually suffers a loss as a result of the fraudulent conduct. *See Stull*, 561 F.2d 429, 432. "In a securities fraud action, such a cognizable injury occurs at the time an investor enters ... a transaction as a result of material misrepresentations." *Zola v. Gordon*, 685 F.Supp. 354, 363 n. 10 (S.D.N.Y.1988) (*"Zola I"*) (quoting *Volk v. D.A. Davidson*, 816 F.2d 1406, 1412 (9th Cir.1987)). In the instant case, Lenz purchased his limited partnership shares April 1, 1981. Accordingly, the six year limitations period expired on April 1, 1987—three years prior to the filing of this action.

■ The court, then, must focus on the two year limitations period, which runs from the moment that plaintiff had actual knowledge of the fraud, or "knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *Robertson v. Seidman & Seidman*, 609 F.2d 583, 587 (2d Cir.1979) (quoting *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975)); *In re Integrated Resources Real Estate Limited Partnerships Securities Litigation*, 815 F.Supp. 620, 637 (S.D.N.Y.1993); *Kronfeld v. Advest, Inc.*, 675 F.Supp. 1449, 1458 (S.D.N.Y.1987). The appropriate test for determining when this limitations period begins to run is an "objective" one, implicating the concepts of inquiry notice and constructive knowledge. *Armstrong*, 699 F.2d at 88; *Integrated Resources*, 815 F.Supp. at 637–38. The Second Circuit has described the test generally as follows:

> Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed

the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him. This rule is fully applicable in cases ... which involve claims of securities fraud. *Armstrong*, 699 F.2d at 88 (citations and internal quotation omitted).

Consequently, the court must engage in a two-fold analysis: 1) determine whether inquiry notice was triggered by "financial, legal or other data available to plaintiff providing [him] 'with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities].' "[7] *Integrated Resources*, 815 F.Supp. at 639; *Cook v. Avien, Inc.*, 573 F.2d 685, 697–98 (1st Cir.1978) and 2) if a duty to inquire arose, examine plaintiff's actions taken in response to it to determine whether plaintiff has carried the burden of demonstrating the exercise of "reasonable diligence," or, should instead be deemed to have had "constructive knowledge" of the fraud. This dual analysis is a particularized one, to be painstakingly undertaken on a case by case basis. As the Chief Judge of the Third Circuit emphasized:

> It is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion. Thus, the duty of rea-

---

7. The data that trigger inquiry notice can come in the form of the offering materials themselves, *See Marlow v. Gold*, [1991 Transfer Binder] Fed. Sec.L.Rep. (CCH) P 96,112, at 90,633–90,635, 1991 WL 107268 (S.D.N.Y.1991); *Landy v. Mitchell Petro. Tech. Corp.*, 734 F.Supp. 608, 617 (S.D.N.Y.1990); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir.1987); *Bender v. Rocky Mountain Drilling Assocs.*, 648 F.Supp. 330, 334–35 (D.D.C.1986); letters and other documents provided to limited partners by the partnership, *Farr v. Shearson Lehman Hutton, Inc*, 755 F.Supp. 1219, 1225 (S.D.N.Y.1991); *Miller v. Grigoli*, 712 F.Supp. 1087, 1088 (S.D.N.Y. 1989); *Hirschler v. GMD Inv. Ltd. Partnership*, [1990–1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) P 95,919, 1991 WL 115773 (E.D.Va.1991); or public disclosures in the media about the financial condition of the defendant and other lawsuits alleging fraud committed by the defendant, *See Arneil v. Ramsey*, 550 F.2d 774, 781 (2d Cir.1977); *Zola v. Gordon*, 701 F.Supp. 66, 70 (S.D.N.Y.1988) ("Zola II"); *Korwek v. Hunt*, 646 F.Supp. 953, 959 (S.D.N.Y.1986), aff'd, 827 F.2d 874 (2d Cir.1987); *Gluck v. Amicor, Inc.*, 487 F.Supp. 608, 613–14 & n. 6 (S.D.N.Y.1980).

sonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings. *Tobacco & Allied Stocks v. Transamerica Corp.*, 143 F.Supp. 323, 331 (D.Del.1956), aff'd, 244 F.2d 902 (3d Cir.1957).

## 2. Deciding Issues of Inquiry Notice and Constructive Knowledge on a Motion for Summary Judgment

■ The court notes at the outset several obstacles to defendant's motion for summary judgment based on inquiry notice and plaintiff's failure to exercise reasonable diligence. First, the defendant must demonstrate that no issue of material fact exists as to whether the plaintiff, if he or she had exercised reasonable diligence in response to a duty to inquire, would have discovered the general fraudulent scheme. *See Kronfeld*, 675 F.Supp. at 1458; *Integrated Resources*, 815 F.Supp. at 638. To trigger the underlying duty to inquire, moreover, defendant must establish that plaintiff acquired information that suggested the *probability* and not merely the *possibility* that fraud had occurred. *See Armstrong*, 699 F.2d at 88; *see also Zola I*, 685 F.Supp. 354, 367 n. 14 (rejecting as "incorrect" the proposition in *Klein v. Shields & Co.*, 470 F.2d 1344, 1347 (2d Cir. 1972), that inquiry notice is triggered when the imputed knowledge is of the possibility of fraud).

■ Second, the court recognizes that the question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide. *See Intre Sport, Ltd. v. Kidder, Peabody & Co.*, 625 F.Supp. 1303, 1310 (S.D.N.Y.1985), aff'd without opinion, 795 F.2d 1004 (2d Cir.1986), vacated on other grounds, 482 U.S. 922, 107 S.Ct. 3203, 96 L.Ed.2d 690 (1987). The Second Circuit stated in *Robertson*:

[i]ssues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case—

similar to the type of inferences that must be drawn in determining intent and good faith, [and w]hen conflicting inferences can be drawn from the facts, ... summary judgment is inappropriate. 609 F.2d at 591.

Nonetheless, "where the underlying facts are undisputed, even factually-based issues may be decided as a matter of law," *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987) and in such circumstances a trial court "should not be reluctant to grant summary judgment." *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F.Supp. 976, 981 (S.D.N.Y.1989); *See, In re General Dev. Corp. Bond Litig.*, 800 F.Supp. 1128, 1136 (S.D.N.Y.1992), aff'd, *Menowitz v. Brown*, 991 F.2d 36 (2d Cir.1993) (holding, in the context of a motion to dismiss, that because the test of inquiry notice is objective, "a court's determination that the information available to a plaintiff in a given instance should (or should not) have given him reason to consider and investigate the probability of fraud is surely warranted in appropriate cases"); *Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F.Supp. 658, 663–64 (S.D.N.Y.1987) (quoting *Rickel v. Levy*, 370 F.Supp. 751, 756 (E.D.N.Y.1974) and *Cook*, 573 F.2d at 697–98, for the proposition that "general suspicions and 'storm warnings' in financial data trigger inquiry notice upon which summary judgment may be granted"); *Kronfeld*, 675 F.Supp. at 1458 ("the cases are legion in which summary judgment has been granted on the ground that the plaintiff should have discovered his cause of action under the securities law before the statute of limitations had run").

If it can be determined from the face of the documents and the facts in evidence on a summary judgment motion that plaintiff was placed on notice of the probability of fraud, and he failed to exercise reasonable diligence in discharging that duty to inquire, the court is compelled to impute constructive knowledge of the fraud to plaintiff and grant defendants' motion for summary judgment as a matter of law.[8] The court confronts precisely such an unambiguous record in this case.

---

**8.** The following is an inexhaustive sampling of recent cases in this Circuit which decided issues

### 3. Plaintiff's Defense of Fraudulent Concealment by Defendants

Before determining whether a material issue of fact exists regarding the exercise of due diligence by the plaintiff, the court must as a threshold matter address plaintiff's defense that the statute of limitations should be tolled because defendants fraudulently concealed information underlying plaintiff's fraud claim. This defense wields special power where, as here, a fiduciary relationship binds plaintiff and defendant. *See Zola I*, 685 F.Supp. 354 (S.D.N.Y. 1988). As this court noted in *Zola*, "when the parties are engaged in a fiduciary relationship, the complaining party can claim the benefit of the fraudulent concealment doctrine even absent an affirmative misrepresentation by the party under the fiduciary duty."[9] *Id.* at 364. In such a relationship, fraudulent concealment occurs if the party under the fiduciary duty fails to meet its "obligations to inform [the other party] of facts underlying the claim." *Jordan v. Ford Motor Co.*, 73 A.D.2d 422, 424, 426 N.Y.S.2d 359, 360–61 (4th Dep't 1980); *Accord, General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 126–28, 272 N.Y.S.2d 337, 338–40, 219 N.E.2d 169, 170–71 (1966). TFC, Associated Inns, and their successor general partners of NTR owed plaintiffs a fiduciary duty. *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1078 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Ayerslee*

of inquiry notice and constructive knowledge as a matter of law. *Armstrong*, 699 F.2d at 88 (motion to dismiss); *Arneil*, 550 F.2d at 781 (summary judgment motion); *Ackerman v. National Property Analysts, Inc.*, 1992 WL 240605 (S.D.N.Y.1992) (motion to dismiss); *Berry Petroleum*, 518 F.2d at 411 (summary judgment motion); *Farr*, 755 F.Supp. at 1225 (summary judgment motion); *Dolan v. Rothschild Reserve Int'l, Inc.*, No. 90 Civ. 1003 (MP), 1991 WL 155770, at *2 (S.D.N.Y.1991) (motion to dismiss RICO claim predicated on securities fraud allegations); *Marlow*, [1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) P 96,112, at 90,633, 1991 WL 107268 (motion to dismiss); *Landy v. Mitchell Petro. Tech. Corp.*, 734 F.Supp. 608, 617 (S.D.N.Y.1990) (motion to dismiss); *Cohen v. Prudential–Bache Sec., Inc.*, 713 F.Supp. 653, 663 (S.D.N.Y.1989) (motion to dismiss); *Henkind v. Brauser*, [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) P 94,488, at 93,123, 1989 WL 54109 (S.D.N.Y. May 16, 1989) (motion to dismiss); *Goodman v. Shearson Lehman Bros., Inc.*, 698 F.Supp. 1078, 1082 (S.D.N.Y.1988) (motion to dismiss RICO claim predicated on securities fraud allegations); *Zola II*, 701 F.Supp. at 70 (summary judgment motion); *Zola I*, 685 F.Supp. at 365 (summary judgment motion); *Bresson*, 641 F.Supp. at 345 (motion to dismiss).

9. This conclusion derived from an analysis of New York law. Even though the principle of equitable tolling constitutes a federal right, it is appropriate to look to state law to determine what constitutes fraudulent concealment under a particular set of facts. *Burks v. Lasker*, 441 U.S. 471, 473, 477–80, 99 S.Ct. 1831, 1834, 1836–38, 60 L.Ed.2d 404 (1979) (looking to state law to determine the power of corporate directors to terminate shareholders' derivative suit brought under federal statutes); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–40, 99 S.Ct. 1448, 1457–65, 59 L.Ed.2d 711 (1979) (adopting state law on priorities to determine priority of federal claims); *Bellis v. United States*, 417 U.S. 85, 95–

101, 94 S.Ct. 2179, 2186–90, 40 L.Ed.2d 678 (1974) (looking to state partnership law to determine whether partnership existed, for purpose of assertion of federal Fifth Amendment privilege against self-incrimination).

The Supreme Court has spoken of a "consistency" test for the incorporation of state law into federal law. See *Burks*, 441 U.S. at 480, 99 S.Ct. at 1838, 60 L.Ed.2d at 404. In general, this mandate has prohibited federal courts from applying state law which poses a "significant threat to any identifiable federal policy or interest," is "unreasonable," or is "specific[ally] aberrant or hostile" to federal policy. Id. at 479–80, 99 S.Ct. at 1837–38 (quoting and citing various cases). The alternative is for federal courts to fashion "a nationally uniform body of law." *Kimbell Foods, Inc.*, 440 U.S. at 728, 99 S.Ct. at 1458, 59 L.Ed.2d at 711 (1979). As the court undertakes this task with respect to fraudulent concealment, New York is an appropriate state to look to for guidance in this endeavor. Although the partnership was organized under the laws of Oklahoma, the relevant statute of limitations is drawn from New York law. Further, neither party disputes that the plaintiff's equitable tolling defenses should be examined under New York law. Finally, because the Uniform Partnership Act ("UPA") and the Uniform Limited Partnership Act ("ULPA") have been adopted in forty nine states and the District of Columbia, including New York *and* Oklahoma, see Unif.Partnership Act Table of Jurisdictions Wherein Act Has Been Adopted, 6 U.L.A. 1 (Supp.1993); Unif.Limited Partnership Act Table of Jurisdictions Wherein Act Has Been Adopted, 6 U.L.A. 298 (Supp.1993) New York law on this point may be considered to be national law. The court concludes that incorporation of New York law regarding fraudulent concealment among partners "will furnish an appropriate and convenient measure of the governing federal law." *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1458 (9th Cir.1986).

*Corp. v. Overlook Sponsor Corp.,* 618 F.Supp. 1398, 1403 (S.D.N.Y.1985), aff'd mem., 800 F.2d 1127 (2d Cir.1986); *Riviera Congress Assocs. v. Yassky,* 18 N.Y.2d 540, 547, 277 N.Y.S.2d 386, 392, 223 N.E.2d 876, 879 (1966). That duty required the General Partners to inform plaintiff of the financial status of his investment in accordance with the Subscription Agreement and Limited Partnership agreements. Defendants do not dispute plaintiff's assertion that they failed to timely provide him with significant documentation, including some annual reports of the Naples Tennis and Bath Club. Accordingly, plaintiff may be entitled to the benefit of some tolling period.

■ The defense of fraudulent concealment, however, does not function as a trump card on issues of due diligence and constructive knowledge, as plaintiff appears to believe. While the doctrine takes into account the information that a plaintiff did not have as a result of defendants' misconduct, a court must still determine whether the information plaintiff *did* receive sufficed to trigger a duty to inquire. *See Hupp v. Gray,* 500 F.2d 993, 997 (7th Cir.1974) ("the fact which would have put a reasonable person on notice of the possibility of fraud ... was not concealed).[10] If plaintiff was indeed alerted as to the probability of fraud, the court must examine plaintiff's response to ascertain whether he or she exercised due diligence in investigating the potential fraud. As stated previously, plaintiff's penalty for failure to discharge the duty to inquire consists of being charged with constructive knowledge of the fraud, thereby beginning the limitations period. This court noted in *Zola* that:

> The plaintiffs, the victims of the defendant's fraud, are entitled to rely on their confidential relationship with [defendant] to toll the statute of limitations "until some event [occurs] which would normally awaken suspicion in the[m].

*Zola I,* 685 F.Supp. at 365. Accordingly, this court, as well as others in the Second Circuit, have charged plaintiffs with constructive

knowledge of an alleged fraud despite the presence of plaintiff's fraudulent concealment defense and a fiduciary relationship between plaintiffs and defendants. *See e.g., Zola I,* 685 F.Supp. 354 (constructive knowledge of alleged securities fraud imputed to plaintiffs in suit against their partners), *Hupp v. Gray,* 500 F.2d 993 (shareholder-corporate directors); *Klein v. Shields* (stockbroker-client); *Simcuski v. Saeli,* 44 N.Y.2d 442, 446, 406 N.Y.S.2d 259, 261, 377 N.E.2d 713, 714 (N.Y.1978) (doctor-patient)

■ The question that must be resolved, then, is whether an event or events occurred prior to May 1988—two years before the commencement of this action—which prove sufficiently decisive to have placed Lenz on inquiry notice of the fraud alleged in his complaint. *See, Zola I,* 685 F.Supp. 354, 365 (IRS letter estimating value of tax shelter constituted "decisive relevant event" in analyzing whether plaintiff had been placed on inquiry notice of fraud). The court answers in the affirmative, and further concludes that Lenz failed to exercise due diligence in discharging this duty to inquire; therefore, he is charged with constructive knowledge of the fraud prior to May 1988. As a consequence, his § 10(b) and Rule 10(b)5 claims are time-barred.

### 4. Information Triggering Inquiry Notice In This Case

Plaintiff claims that he discovered the alleged fraud only after the sale of the assets of the Limited Partnership in 1989, when the law firm of Russ & Russ "obtained [for Lenz] all of the documentation with respect to the various financial transactions occurring during the previous years." (Plaintiff's Mem. at 31) Prior to that time, he asserts, he was merely dissatisfied with the lack of information that had been supplied to him by the general partners. This contention is simply not credible in light of the undisputed facts. The doctrines of inquiry notice and constructive knowledge evolved precisely to avoid tolling a statute for a plaintiff's "leisurely

---

**10.** The court notes that the *Hupp* court misstates the standard for triggering the duty to inquiry as the "possibility" rather than the "probability" of fraud, but cites the decision solely for the propo-
sition that a claim of fraudulent concealment can be overcome by a showing that evidence sufficient to trigger a duty to inquire reached the plaintiff.

discovery of the full details of the alleged scheme." *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970). A reasonably diligent person in Lenz's place would have been alerted to the probability of fraud alleged in Lenz's complaint long before May 1988, and would have taken more prompt and extensive actions than those of Lenz in response to this inquiry notice.

Lenz's initial clue that something was amiss with his investment came in the form of the offering materials themselves. Plaintiff alleges that Charles Holmes made two primary oral representations: 1) The Limited Partnership would lose money for three years, thus sheltering a substantial portion of Lenz's income, and then begin to show a profit in 1983, at which point Lenz would begin to receive cash distributions guaranteed at the rate of 10% per year and likely to reach 15% annually: and 2) A contract was already in place, which obligated the surrounding condominium project to purchase the Club for $8,000,000, if the option was exercised within five years of the Limited Partnership's formation, and $11,000,000 if the Club was purchased after eight or more years.

Yet the Partnership and Subscription Agreements, which plaintiff testified at deposition that he signed and understood, told an entirely different story. As described *supra* at 365–66, Lenz specifically warranted in both agreements that he understood the speculative nature of the investment and had not relied on any projections made by the sellers. Lenz acknowledged in deposition testimony that he understood the binding Subscription and Partnership agreements to contradict directly Holmes' oral representations, but chose to ignore them because he trusted Holmes and Mark Rose, and "had confidence that this deal would succeed." (Lenz Dep. at 154) Moreover, he did not inquire of Holmes or Rose about the contradictions.

The court does not find the discrepancy between the oral representations made to Lenz prior to the sale of his limited partnership interest and the written agreements he signed to consummate that sale to be sufficient by itself to trigger a duty to inquire,[11] but it should have given Lenz cause for concern. When this discrepancy combined with subsequent events, however, plaintiff should have sprung into action.

As the court has already noted, during the course of 1981 and 1982, Lenz became dissatisfied with the lateness of the general partner's mailings of necessary tax information and their lack of responsiveness to his inquiries. In fact, he testified at his deposition that the only reason he did not withdraw from the partnership at that time was that under the terms of the partnership agreement he would lose the money he had already invested. Significantly, then, Lenz cannot claim to have been in a state of deluded euphoria with respect to his investment when the critical events of 1984–86, discussed below, took place.

In 1984 and 1985, Lenz received information that clearly revealed Holmes' representations to be misrepresentations. First, although Holmes had allegedly told Lenz that he would begin to receive distributions based on NTR's profits in 1983, David Rose's letter of October 26, 1984 notified Lenz that NTR was projected to lose money at least through 1986. The K–1 tax forms that Lenz received for 1983–1987 confirmed that NTR remained an unprofitable operation. Second, in response to Lenz's November 13, 1984 letter demanding to know when NTR would be sold at a profit, David Rose informed him in the February 7, 1985 letter that any future sales price for the Limited Partnership was purely speculative and that the condominium project constituted merely a possible rather than a guaranteed purchaser of NTR. This letter made no reference to and was indeed completely inconsistent with the existence of an outstanding contract between the Limited Partnership and the condominium association. Thus, as of February 7, 1985, developments regarding Lenz's investment in NTR—developments documented *in writing*

---

11. The court is influenced by the evidence that Lenz, at the time of his initial purchase of the limited partnership interest, was not a sophisticated investor. The relevance of his increasing sophistication as an investor, particularly with respect to real estate limited partnerships, is addressed *infra* at 375–76.

for Lenz—had clearly given lie to both of Holmes' central representations.

In March 1986, Lenz received the excerpt of the New York Times article describing Holmes conviction for fraud in Tulsa. Lenz acknowledged having read the excerpt, although he did not obtain the full text of the article from the newspaper. (Lenz Dep. at 392–93).

The court holds that as of March 1986, at the latest, Lenz had possession of sufficient facts to make him aware of the probability of fraud, and consequently plaintiff was required to exercise reasonable diligence in order to discharge this duty to inquire. The K–1 tax information and Rose's letters indicated to Lenz that the value of his investment, for which Holmes had guaranteed profitability after three years, had in fact plummeted and would continue to do so for at least three more years. This court, and others both within and without the Second Circuit, have held that clear evidence that an investment asset has declined in value or has been subject to an artificially inflated estimate of its value, in direct contradiction of representation made to the plaintiff at the time of sale, constitutes inquiry notice as to the probability of fraud. *See Zola I*, 685 F.Supp. 354 (plaintiffs were on inquiry notice of fraud upon receipt of IRS letter valuing assets of limited partnership at an amount significantly less than defendant had represented at sale); *Hupp*, 500 F.2d 993 (plaintiff placed on inquiry notice when stock price, which broker promised would increase over period in question, proceeded to fall); *Gaudin v. KDI Corp.*, 417 F.Supp. 620 (S.D.Ohio 1976), aff'd, 576 F.2d 708 (6th Cir.1978) and *Berry Petroleum*, 518 F.2d 402, 410 (among indicia that should have put plaintiff on notice was drop in value of stock during period in question).

Further, in this Circuit awareness of other lawsuits or criminal fraud convictions involving a defendant puts a plaintiff on inquiry notice of the probability of fraud within another transaction involving the defendant. *Berry Petroleum*, 518 F.2d 402; *Zola v. Gordon*, 701 F.Supp. 66 (S.D.N.Y.1988) ("*Zola II*") In this case, there is not even an issue as to whether Holmes' conviction was suffi-ciently publicly notorious that Lenz should be charged with notice of it. Lenz admits that he received and read the excerpt of the article, yet he remembers taking no action in response to it and thinking only that "it was unfortunate that Charlie found himself in trouble." (Lenz Dep. at 393) In the court's view, this news should have stimulated more than empathy in an ordinarily intelligent person. It should have set off alarm bells. Holmes had made the representations concerning NTR that Lenz had relied upon in the face of contradictory written partnership agreements, reliance predicated at least in part upon Lenz's regard for Holmes as an investment expert who, along with the rest of the general partnership would "take care of" Mr. Lenz notwithstanding the written disclaimers. The New York Times excerpt revealed Holmes to have committed fraud on at least one other occasion, and notified Lenz of this fact at a time almost simultaneous with his receipt of the aforementioned financial data, which flew in the face of Holmes' original claims. This article, then, would have suggested to a person of ordinary intelligence in Lenz's position that something was rotten in the state of Florida and that the problem lay with his investment.

A final factor contributes to the court's conclusion that plaintiff confronted a duty to inquire by March 1986, namely, Lenz's increasing sophistication as an investor during the period between 1981 and 1986. *See, Zola I*, 685 F.Supp. at 370 n. 18 (noting educational level and investment sophistication of plaintiffs); *Marlow*, 1991 WL 107268 at * 9 (emphasizing that plaintiff was sophisticated rather than "stereotypical, naive" investor). In his reply brief and accompanying affidavit, Lenz assumes that in analyzing issues of inquiry notice a court focuses solely upon plaintiff's investment experience at the time he or she purchased the investment. This contention misapprehends the actual nature of the judicial inquiry involved. Determinations regarding the duty to inquire and the concomitant duty to exercise reasonable diligence necessarily implicate events occurring after the initial purchase. In fact, the judicial analysis must center on those events

because its goal lies in determining whether they would alert the ordinarily intelligent person to the probability of fraud. The sophistication of the investor *at the time of each of these post-purchase events* is thus extremely relevant, because the investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced the investor to undertake an inquiry.

As previously discussed, between 1981 and 1986 Lenz entered a number of limited partnerships, several of which engaged in real estate investments. He encountered sales presentations and offering materials which were uniformly more comprehensive than and otherwise superior to their analogs in the NTR transaction. In fact, he functioned as the general partner in at least one of these partnerships, performing the very administrative functions that he witnessed the Aircoa general partners fail to fulfill. In his deposition, Lenz acknowledged that his other investment experiences highlighted for him the problems he was experiencing with the NTR limited partnership. Consequently, it is reasonable to find that his increasing sophistication as an investor should have magnified the effect of the above-discussed events and forced him to conclude that fraud probably

lay behind the unhappy history of his investment.

To reiterate, the foregoing combination of indicia compels the court to determine that, as a matter of law, plaintiff was placed on inquiry notice of the probability of fraud no later than March 1986.[12]

### 5. Plaintiff's Exercise of Diligence In Response to Inquiry Notice

Events following March 1986 reveal that Mr. Lenz simply does not carry his burden of demonstrating that he exercised reasonable diligence in response to inquiry notice of defendants' alleged fraud. He testified at deposition that on an unspecified date in 1986 or early 1987, he spent "the day" attempting unsuccessfully to contact by phone persons within the Frates/Aircoa/Fracorp hierarchy who were responsible for NTR. (Lenz Dep. 331–340) After that point, he made no further attempts either by phone or in writing to inquire as to his investment until after the sale of NTR in September 1989. (*Id.*) Although he had consulted with an attorney in November 1984 regarding the NTR investment,[13] Lenz also made no additional efforts to retain legal services to protect his rights after March 1986.[14]

---

12. Before proceeding to scrutinize the reasonableness of plaintiff's diligence in response to inquiry notice of the alleged fraud, the court notes that "neither reassurances accompanying the relevant notice nor the continued failure to disclose the facts allegedly misrepresented in the first place, relieves the plaintiff of his duty to undertake reasonable inquiry or tolls the statute of limitations." *Integrated Resources*, 815 F.Supp. at 640; *see also Farr*, 755 F.Supp. at 1228 ("statements of cautious optimism, reiterations of the goal of providing income to investors, and explanations for past poor performance do not rise to the level of affirmative concealment necessary to excuse a reasonable investor from the duty of inquiry presented by cold numbers"); *Zola I*, 685 F.Supp. at 366–67 (rejecting plaintiff's contention that the defendant's continuing failure to disclose material facts which originally had been misrepresented constituted fraudulent concealment sufficient to toll the statute of limitations). Consequently, plaintiff here cannot argue that, for example, the reassurances contained in Rose's letter of February 7, 1985 tolls the statute of limitations. Nor do any alleged efforts by defendant's to conceal the original misrepresentations after March 1986 have any effect on Lenz's duty to investigate diligently

the potential fraud. As this court noted in *Zola*, these developments are "simply irrelevant to plaintiff's duty to inquire" *Id.* at 368 which in this case was triggered as of March 1986 by the events described above.

13. The court notes here that while the test for inquiry notice is an objective one, plaintiff might not survive the subjective or even actual knowledge standard for which he argues. Although Mr. Lenz remained vague in his deposition testimony regarding the exact matters that he discussed with the attorney he consulted in 1984, a specialist in tax shelter litigation, he concedes that he might have discussed litigation against the general partners at the time. (Lenz Dep. at 265–66).

14. The court observes that plaintiff's failure to consult an attorney becomes an even more egregious deficiency of reasonable diligence in light of his statement that through the efforts of present counsel he was able to obtain details of the final sale transaction, which led him to file this suit. He offers no explanation as to why an attorney hired in 1986, 1987, or 1988 could not have obtained documentation of all of the inter-

Confronted with this pathetic showing of diligence in response to inquiry notice "the court can only reach one conclusion, that plaintiff remained narcose." *Zola I*, 685 F.Supp. at 368; *Accord, Integrated Resources*, 815 F.Supp. at 640. Lenz' own testimony at deposition reflects a "wait and see" attitude in 1986, rather than a vigorous effort to inquire into the probability of fraud:

> Much of what I had anticipated was going to take place had not taken place. I never had any distributions out of the property. It was indicated that I was going to have distributions. I didn't get them. The tremendous lack of information, the tremendous lack of candor in my behalf. I felt that I really hadn't been dealt with properly, and I still feel that way.

> It was my assumption at that point that whatever it was that had taken place obviously had not been structured in my best interest, which is why we are here [in litigation].

> If the project was going to be sold in 1987 or '86, as had been indicated in their [February 7, 1985] letter, I figured let it get sold and I'll take my money when it is sold. I'm through with the tax shelter aspect of the investment and I'll just wait until it gets sold, take my profit and call it a day.

(Lenz Dep. at 339–40) This lethargy, coupled with plaintiff's initiation of § 10(b) claims four years hence, epitomizes the abuse of federal securities laws which courts must guard against by vigilantly investigating issues of inquiry notice and due diligence. As the Second Circuit emphasized in *Cook*, courts must not:

> ... permit the securities acts to be used as havens for speculation and a buffer against any investment loss. When faced with knowledge of a company's serious financial difficulty, an investor cannot be allowed to wait for market increases knowing that if growth does not take place the securities acts will provide the insurance against loss.

Instead, the exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention. Although this principle is particularly true when the nondisclosed facts are negligently omitted, even where facts are fraudulently withheld a plaintiff cannot be allowed to ignore the economic status of his or her investment.

573 F.2d at 695. Thus, although Lenz was entitled to respond to inquiry notice of the probability of fraud involving his NTR investment by speculating that the property would ultimately be sold at a profit and that he would escape largely unscathed from the experience, he is *not* entitled to exploit the securities laws in order to profit from this ostrich-like behavior. Lenz's failure to inquire with reasonable diligence into the probability of fraud therefore charges him with constructive knowledge of the fraud alleged in his complaint as of March 1986. Accordingly, his 10(b) claims are time-barred under both prongs of New York's six year/two year statute of limitations for securities fraud.

### State Law Claims

#### A. Subject–Matter Jurisdiction Over Plaintiff's State Law Claims

Plaintiff argues that even absent a surviving federal question, the court maintains jurisdiction over his pendent state claims for an accounting, breach of fiduciary duties, conversion, and negligence pursuant to the doctrine of diversity of citizenship.[15]

■ Defendants respond that the court lacks diversity jurisdiction because the requisite *complete diversity among defendants* and plaintiffs is absent. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Defendants point out that the partnership is a named plaintiff and, for diversity

---

im transactions ultimately complained of in this lawsuit. Given the numerous indicia of fraud discussed above, Lenz' failure to make this simple request of an attorney is unacceptable.

**15.** The diversity statute is 28 U.S.C. § 1332, and provides in relevant part:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the as value of $50,000 ... and is between (1) citizens of different states.

purposes, the citizenship of a limited partnership is the citizenship of each of its partners, both general and limited. *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990); *Penteco Corp. v. Union Gas System, Inc.*, 929 F.2d 1519 (10th Cir. 1991); *Haggerty v. Comstock Gold Company, L.P.*, 770 F.Supp. 216 (S.D.N.Y.1991). Accordingly, plaintiff NTR is deemed to be a citizen of both New York (Lenz's residence) and of Colorado (general partner AEI's state of incorporation and principal place of business). Complete diversity is lacking because plaintiff NTR and defendant AEI are citizens of the same state.

Plaintiff replies that NTR is merely a nominal party, and is in no way necessary to the action; therefore, the court may drop NTR from the caption or disregard it for purposes of diversity jurisdiction. (Plaintiff's Memo. p. 37, citing *Salem Trust Co. v. Manufacturers' Finance Co.*, 264 U.S. 182, 44 S.Ct. 266, 68 L.Ed. 628 (1924); *District of Columbia v. Transamerica Insurance Company*, 797 F.2d 1041 (D.C.Cir.1986); *Truglia v. KFC Corporation*, 692 F.Supp. 271 (S.D.N.Y.1988), aff'd, 875 F.2d 308 (2d Cir.1989)). The court disagrees and finds, for reasons set forth below, that diversity jurisdiction is lacking for all of plaintiff's pendent state claims with the exception of the action for an accounting.

## 1. Claims That A Limited Partner May Bring Against General Partners

■ Three kinds of legal claims may be appropriate when a limited partner seeks to redress breach of fiduciary duties and other wrongdoing by the general partners of the partnership.[16] First, the limited partner may be able to pursue, as an individual, direct claims against the general partners. *Fulton v. Baxter*, 596 P.2d 540 (Okla.1979);

*Newburger, Loeb, & Co., Inc.*, 563 F.2d at 1075–76 n. 23; *Whitney v. Citibank*, 1985 WL 566 (S.D.N.Y.1985); *Shandell v. Katz*, 95 A.D.2d 742, 464 N.Y.S.2d 177 (1st Dep't 1983). Second, the limited partner may pursue direct claims against the general partners by means of a representative action in the form of a class action lawsuit on behalf of all the limited partners. *Curley v. Brignoli, Curley & Roberts Associates*, 915 F.2d 81 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1430, 113 L.Ed.2d 484 (1991); *Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 277 N.Y.S.2d 377, 223 N.E.2d 869 (N.Y.1966) Finally, the limited partner may bring a derivative suit on behalf of the partnership against the general partners, alleging the relevant misconduct against the general partners. 54 Okla.Stat. § 357 (1984) (authorizing derivative suit by limited partner where general partner refuses to bring action or if demand on general partners is not likely to succeed); N.Y. Partnership Law § 115 (McKinney 1990) (same). *Klebanow v. New York Produce Exchange*, 344 F.2d 294 (2d Cir.1965); *Riviera Congress Associates v. Yassky*, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876.

■ The nature of a limited partner's suit is critical to any analysis of subject-matter jurisdiction under *Carden.* Simply put, in a derivative action brought by a limited partner, the limited partnership is an indispensable party. *Smith v. Bader*, 458 F.Supp. 1184, 1187 (S.D.N.Y.1978); *see also, Heinz v. Simon and Flynn, Inc.*, 444 F.Supp. 114, 117 (S.D.N.Y.1978) (same in regard to joint venturers); *Saxe, Bacon & Bolan, P.C. v. Martindale–Hubbell, Inc.*, 521 F.Supp. 1046, 1048 (S.D.N.Y.1981); *Whalen v. Carter*, 954 F.2d 1087, 1095 (5th Cir.1992); *Buckley*

---

**16.** The court observes that Oklahoma law discussing the issue of direct and representational suits in the limited partnership context is sparse. As a result, where compelling Oklahoma case authority is absent the court will turn to the common law of New York and other leading jurisdictions. *Rogers v. Grimaldi, MGM/UA*, 875 F.2d 994, 1002 (2d Cir.1989) (in diversity cases where New York is the forum state, court may presume that the unsettled common law of another state would resemble New York's but must also examine the law of other jurisdictions); Note, *Standing of Limited Partners to Sue Deriva-*tively, 65 Columbia L.Rev. 1463 (1965) (developments in New York law, originator of both the limited partnership and the derivative suit, can be expected to influence the development of the limited partnership as a legal concept nationally); Edwin W. Hecker, Jr., *Limited Partners' Derivative Suits Under The Revised Uniform Limited Partnership Act*, 33 Vanderbilt L.Rev. 343, 356 (1980) ("New York, having recognized limited partners' derivative suits since 1966, already has a developing body of case law concerning this issue that should prove useful in other jurisdictions.").

*v. Control Data Corp,* 923 F.2d 96, 98 (8th Cir.1991); *Koster v. Lumberman's Mut. Casualty Co.,* 330 U.S. 518, 522–23, 67 S.Ct. 828, 830–31, 91 L.Ed. 1067 (1947) (defendant corporation is real party in interest in derivative suit by shareholder); [17] 3B Moore's Federal Practice ¶ 23.121[1] at 23.1–100 (1987) (the corporation is an indispensable party in a derivative suit). If Lenz's state law claims are derivative, then, plaintiff's argument that NTR represents a nominal party, which can be dropped or ignored for diversity purposes, must fail.

■ By contrast, in a direct individual or representative action brought by a limited partner against general partners, the limited partnership itself may be dropped from the action or disregarded for diversity purposes. *See e.g., Whitney,* 1985 WL 566 at * 5 (finding that limited partnership is not an indispensable party under Fed.R.Civ.P. 19 in limited partner's suit direct claim against general partners); *Curley,* 915 F.2d at 12 (same in context of a class action by limited partners against general partners). Therefore, if Lenz's claims constitute direct actions, whether individual or representative, plaintiff's contention that NTR may be treated as a nominal party retains some force. Given the foregoing authority, the court must classify plaintiff's various state law claims within the three-tiered framework set forth above.

### a. Individual Direct Claims

■ It is well-settled that the only direct lawsuit against general partners that a limited partner can bring in an individual, non-representative capacity consists of an action for an accounting. *See, Ewing v. Owens,* 441 P.2d 964 (Okla.1968) (partner should not be heard on legal claims against co-partner until plaintiff has pursued action for an accounting); *see also, Herrick v. Guild,* 257 A.D. 341, 342, 13 N.Y.S.2d 115, 117 (1st Dep't 1989) (stating that "suits between partners should be brought in equity, particularly for an accounting, and that an action at law may not be maintained until after an accounting and a balance struck"); *Blattberg v. Weiss,* 61 Misc.2d 564, 566, 306 N.Y.S.2d 88, 91 (N.Y.App.Div.1969) (noting that capacity of limited partners to initiate class actions and derivative suits against general partners does not disturb settled rule regarding individual, non-representative claims). Accordingly, the court addresses the merits of plaintiff's motion for summary judgement granting an accounting *infra* at 381–85.

### b. Representative Direct Claims vs. Derivative Claims

■ With respect to the allegations of breach of fiduciary duty, conversion, and negligence, plaintiff himself has characterized his claims as ﹘ derivative in nature. Plaintiff's Memo. at 3, 37. Although it should be noted that in determining whether a claim is derivative or direct, the court must look to the nature of the wrongs alleged in the body of plaintiff's complaint, and is not limited by plaintiff's characterization or stated intention *See Litman v. Prudential–Bache Properties, Inc.,* 611 A.2d 12, 15 (Del. Ch.1992), an analysis of plaintiff's complaint confirms this classification of the remaining state law claims.

In both the corporate and partnership context,[18] the determination of whether a suit is

---

17. The court's reliance upon corporate cases in this analysis is discussed *infra* at 379–80 n. 18. Additionally, the court notes that none of the cases cited by plaintiff for the proposition that parties who lack an interest in the outcome of litigation, or nominal parties, need not be diverse from other parties involves a derivative suit in either the corporate or limited partnership context.

18. The court relies throughout this decision upon corporate as well as partnership case law in analyzing the nature of plaintiff's lawsuit because the determination of whether a fiduciary duty lawsuit is derivative or direct ﹒in nature is substantially the same in the corporate and limited partnership contexts. *See e.g., Strain v. Seven Hills Assocs., L.P.,* 75 A.D.2d 360, 429 N.Y.S.2d 424, 431–32 (1980); *Litman v. Prudential–Bache Properties,* 611 A.2d 12, 15 (Del.Ch.1992). This result derives from similarity in the duties of a general partner and a corporate director. *See Boxer v. Husky Oil,* 429 A.2d 995, 997 (Del.Ch. 1981). More specifically, it follows that the determination of the nature of claims arising from a breach of analogous duties would also prove very similar. *See generally, Strain,* supra, 429 N.Y.S.2d at 431–432 (after noting that stockholders and limited partners hold similar positions within their respective entities, the Court looked to corporate law for guidance in determining the nature of a suit by a limited partner); *Field*

derivative or direct turns on the nature of the injury alleged and the entity which sustains the harm. "The distinction between derivative and individual actions rests upon the party being directly injured by the alleged wrongdoing." *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 351 (Del. Supr.1988). In a derivative suit, a shareholder sues on behalf of the corporation for harm done to the corporation. *Kramer,* 546 A.2d at 351. On the other hand, a shareholder may bring a direct action for injuries done to him in his individual capacity if he has "an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." *Moran v. Household Int'l, Inc.,* 490 A.2d 1059, 1070 (Del.Ch.1985) (citations omitted), aff'd, 500 A.2d 1346 (Del.Supr.1985). In other words, "[f]or a plaintiff to bring an individual action, he must be injured directly or independently of the corporation." *Kramer,* 546 A.2d at 351. Similarly, to bring a direct representative action against a general partner, a limited partner must demonstrate either direct injury or an injury that exists independently of the partnership. *Jones v. Sageeyah Development, Ltd.,* 833 P.2d 1235 (Okla.1992); *Re v. Weksel,* 130 A.D.2d 640, 515 N.Y.S.2d 568, 569 (1987), appeal denied, 71 N.Y.2d 803, 527 N.Y.S.2d 769, 522 N.E.2d 1068 (1988); Plaintiff here fails to make such a showing.

The gist of plaintiff's breach of fiduciary duty, conversion, and negligence claims consists of allegations that defendants: 1) Failed to run NTR as a for-profit entity, and in fact locked the Limited Partnership into a sale-leaseback arrangement which could not cover the Limited Partnership's mortgage payments; 2) Entered into various transactions, such as loan agreements and mortgages, which encumbered the assets of the Limited Partnership and/or generated proceeds that were never distributed to the Limited Partners; and 3) Reduced the value of plaintiff's stake in the Limited Partnership by exploiting NTR for the benefit of the general partners', or their affiliates', financial interest in management fees and the condominium development adjacent to NTR.

Closer scrutiny reveals the first two allegations to complain of the same injury, namely, reduced income to the Limited Partnership as a result of defendants' alleged misconduct. According to Lenz, defendants' mismanagement of NTR—epitomized by the unprofitable sale-leaseback arrangement—doomed the Limited Partnership to a weaker income stream than sound administration of the project would have maintained. As a consequence, Lenz and the other limited partners failed to receive any distributions of profits. Correspondingly, defendants' entrance into the mortgages and loan agreements impaired the capacity of NTR to generate income for the Limited Partnership, again preventing Lenz and other limited partners from receiving cash distributions.[19]

By their own terms, these claims seek redress for injury inflicted directly upon the Limited Partnership. Defendants' misconduct damaged Lenz only to the extent of his proportionate interest in the enterprise. Consequently, plaintiff has failed to allege direct injury to limited partners or one that existed independently of the partnership. Limited partners who seek redress for such indirect injuries must do so through a derivative action. *Strain v. Seven Hills Associates,* 75 A.D.2d 360, 429 N.Y.S.2d 424 (1st Dep't

---

*Enters. v. Gresser,* 160 Wis.2d 45, 468 N.W.2d 30 (TABLE) (1990) (text in Westlaw, at 19), rev'w denied, 471 N.W.2d 509 (Wis.1991) (the Court looked to the corporate standard contained in *Bio–Scientific Laboratory, Inc. v. Todd,* 149 Ill. App.3d 845, 103 Ill.Dec. 171, 174–75, 501 N.E.2d 192, 195–96 (1986) for the determination of whether a lawsuit was direct or derivative), appeal denied, 471 N.W.2d 509 (Wis.Supr.1991); 59A Am.Jur.2d Partnership § 1397 (1987) (author states that corporate law may be looked to for guidance in determining whether an action by a limited partner is derivative or direct).

**19.** Plaintiff's claim also alleges misappropriation of income belonging to the Limited Partnership to the extent that the mortgage transactions and loan agreements generated proceeds which might have resulted in distributions to Mr. Lenz and other limited partners. This claim is susceptible to the same analysis as others which relate to the income of the Limited Partnership.

1980); *Blattberg,* 61 Misc.2d at 566, 306 N.Y.S.2d at 91.

As to the final injury, the diminution in value of Lenz's limited partnership stake due to the general partners' mismanagement, a direct claim is clearly inappropriate to address such an injury. The diminution in value flows from damage inflicted directly upon the Limited Partnership. In the corporate context, it is well established that:

> ... where a corporation suffers loss because of the acts of officers, directors, or others which diminish or render valueless the shares of stock of a stockholder, the stockholder does not have a direct cause of action for such damages, but has a derivative cause of action on behalf of the corporation to recover the loss for the benefit of the corporation.

429 N.Y.S.2d at 432 (internal citations omitted); *Accord, Lewis v. Spencer,* 577 A.2d 753 (Del.Supr.1990); *Bokat v. Getty Oil Co.,* 262 A.2d 246 (Del.Supr.1970). This reasoning applies with equal authority to limited partnerships. The court in *Strain,* for example, noted that "By logical extension it appears that a limited partner's power to vindicate a wrong done to the limited partnership and to enforce redress for the loss or diminution in value of his interest is no greater than that of a stockholder of a corporation." 429 N.Y.S.2d at 432; *Accord, Litman,* 611 A.2d at 16.

In light of the foregoing legal precedent, the court must conclude that plaintiff's allegations of negligence, conversion, and breach of fiduciary duty complain solely of direct injury to the Limited Partnership, and Lenz has suffered injury only to the extent of his proportionate interest in the Limited Partnership; therefore, these claims are derivative in nature. Accordingly, under the rule of *Carden* this court lacks diversity jurisdiction over plaintiff's state law claims alleging breach of fiduciary duty, negligence, and conversion.

**2. Pendent Jurisdiction**

In the absence of a surviving federal question, the court declines to exercise subject-matter jurisdiction over the pendent state claims for breach of fiduciary duty, conversion, and negligence. *United Mine Workers' Union v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Federman v. Empire Fire and Marine Ins. Co.,* 597 F.2d 798, 809 (2d Cir.1979) ("dismissal of the state claim is the recommended procedure ... in cases where the federal claim is disposed of prior to the trial").[20]

**B. Merits of Plaintiff's Action For An Accounting**

**1. Waiver**

Defendants argue that plaintiff explicitly waived any right he might have had to an accounting in the Partnership Agreement. Section 14.3 of that document provides in pertinent part:

> ... [E]ach of the Partners hereby agrees to and accepts the provisions of this Agreement as his sole entitlement in the event

**20.** While plaintiff's action for an accounting is properly before the court on the grounds of diversity jurisdiction, it does not follow that the court can exercise pendent jurisdiction over state claims that can be decided only if parties are joined whose presence would destroy complete diversity. *See, Finley v. U.S.,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (pendent party jurisdiction permissible only where explicitly authorized by statute): Erwin Chemerinsky, *Federal Jurisdiction,* 281 (1989) (Supreme Court precedent, prior to *Finley,* militated against pendant party jurisdiction in diversity cases—the most obvious prohibited maneuver being an attempt by a plaintiff to use pendent party jurisdiction to name non-diverse defendants). Such a result would frustrate the diversity requirement itself. The court notes that the Judicial Improvements Act of 1990, 28 U.S.C. § 1367, superseded *Finley.* The Act, however, expressly applies only to actions commenced after December 1, 1990. Further, with respect to pendent-party jurisdiction in diversity cases, § 1367(b) has been interpreted simply to codify and make clear *Finley*'s holding. *C.D.S. Diversified v. Franchise Finance Corp.,* 757 F.Supp. 202 (E.D.N.Y.1991).

In addition, the court observes that even if plaintiff's derivative claims were properly before the court, dismissal would be required because plaintiff has failed to comply with the procedural requirements of 54 Okla.Stat. § 359, which state: "In a derivative action, the complaint shall set forth with particularity the effort of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort." Lenz has neither made a demand on the general partners nor alleged in the complaint why such a demand would be futile.

he becomes in default of this Agreement or upon any termination of his interest in the Partnership. Therefore, each Partner hereby waives and renounces any and all rights he may have under any applicable law with regard to an inventory of assets, an appraisal, an accounting, and any similar matter, and agrees that the provisions of this Agreement shall control.

According to defendants, the sale of NTR in December 1989 triggered this provision by terminating the partnership pursuant to § XIII(B) of the Partnership Agreement, which states that the partnership terminates upon the "disposition by the Partnership of its entire interest in all of its property ..." Because NTR was sold at a loss, its sale generated no assets for the partnership to retain, thereby terminating the partnership.

Plaintiff responds with a two-fold argument. First, he contends that § 14.3 does not constitute a broad scale waiver of plaintiff's right to an accounting. Rather, the clause is inapplicable because plaintiff was never in default of the provisions of the Partnership Agreement, nor did he terminate his interest in the Limited Partnership. Second, plaintiff asserts that the waiver provision violates the statutory prohibitions of Oklahoma statutes and therefore cannot be enforced at law. The court considers these arguments *seriatim*.

### 2. Scope of Waiver

■ Plaintiff's reading of the waiver is a tortured one. He appears to contend that only he can terminate his own interest in the partnership. The clause reads, however, "upon *any* termination of his interest ..."

The only reasonable interpretation of this language is that termination of the partnership would terminate Lenz's limited partnership stake. A partnership ceases to exist for most purposes upon termination, and, in any case, limited partners at that point lose any joint rights to partnership property. *See* Bromberg and Ribstien, *Partnership*, § 7.01(b), p. 7:6 (1991). The court therefore holds that the sale of NTR triggered § 14.3 of the Partnership Agreement and the waiver contained therein.

### 3. Enforceability of the Waiver Provision

Plaintiff argues that Oklahoma statutes mandate a limited partner's right to an accounting[21] and a contractual provision in derogation of those statute is not enforceable. The court disagrees.

■ Plaintiff has conflated the well-settled legal doctrine that a court will not enforce a contractual provision that permits an act *prohibited* (expressly or impliedly) by statute, with the meritless proposition that a court will not enforce a contractual provision affecting a right *conferred* by statute. To follow the latter tack would drastically impair commercial transactions in a modern economy, because there are numerous substantive and procedural rights conferred by statute that parties routinely waive as part of commercial agreements. The court here offers but one of many examples, namely, a party's "right" under federal statutes to have a contract dispute heard in court. Nevertheless, courts unhesitatingly enforce contractual provisions mandating that all disputes arising from the transaction be resolved in arbitra-

21. The relevant Oklahoma statutes are 54 Okla. Stat. 1971 § 151 (ULPA), § 221 (UPA), and § 222 (UPA). They provide, in relevant part, as follows:
§ 151. Rights of a limited partner
(a) A limited partner shall have the same rights as a general partner to:
 (2) Have on demand true and full information of all things affecting the partnership, and a formal account of partnership affairs whenever circumstances render it just and reasonable.
 . . . . . . .
§ 221. Partner accountable as a fiduciary
(1) Every partner must account to the partnership for any benefit, and hold as trustee for it any

profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property ...
§ 222. Right to an account
Any partner shall have the right to a formal account as to partnership affairs:
 (a) If he is wrongfully excluded from the partnership business or possession of its property by his copartners,
 (b) If the right exists under the terms of any agreement,
 (c) As provided by [§ 221]

tion. *See e.g., Wetzel v. Covenant Oil Corporation,* 733 P.2d 424 (Okla.1987) (enforcing arbitration provision in limited partnership agreement even where limited partners sued general partner for fraud in the inducement of the agreement itself). Similarly, parties have a "right" conferred by statute to have a dispute arising from a contract settled under law of the forum state, yet forum selection provisions in contracts are legally enforceable.

The fact that Oklahoma statutes confer upon plaintiff a "right" to an accounting absent a contractual provision to the contrary, then, does not resolve the question of whether a waiver of that right is enforceable. Rather, the court must determine whether policy concerns and decisional precedent militate that the waiver of the right to an accounting is *prohibited* by Oklahoma law.

 The default rule concerning the rights and duties among partners under Oklahoma law, and the law of other jurisdictions which have adopted the UPA and ULPA, is that the intent of the partners as expressed in the partnership agreement controls. The Tenth Circuit has held:

> ... in so far as the agreement provides therefor, the rights and liabilities of the partners themselves are to be determined by the provisions of the partnership contract.

*Gilroy v. White Eagle Oil Co.,* 104 F.Supp. 247, 250 (N.D.Okla.), aff'd, 201 F.2d 113 (10th Cir.1952); *see also, Lanier v. Bowdoin,* 282 N.Y. 32, 38, 24 N.E.2d 732, rearg. den. 282 N.Y. 611, 25 N.E.2d 391

> ("In the absence of prohibitory provisions of the statutes or of rules of the common law relating to partnerships, or considerations of public policy, the partners of either a general or a limited partnership, may include in the partnership articles any agreement they wish concerning the sharing of profits and losses, priorities of distri-

bution on winding up of the partnership affairs and other matters. If complete as between the partners, the agreement so made controls.")

Section 218 of the Oklahoma UPA codifies this doctrine, stating that "the rights and duties of the partners in relation to the partnership shall be determined ... subject to any agreement between them ..." 54 Okla. Stat. § 218 (1971).[22] The question before the court becomes whether the right to an accounting falls outside the scope of this rule. It does not.

There appear to be no Oklahoma cases holding directly that an accounting may be waived by contract. Oklahoma courts have found in other contexts, however, that a waiver embodied in the partnership agreement controls even where the right affected is a substantive one conferred by statute. For example, the Oklahoma Court of Appeals has held that a partnership agreement may override certain of a partner's fiduciary duties. In *Singer v. Singer,* 634 P.2d 766 (Ct.App.Okla.1981), the partnership agreement at issue permitted the partners to enter into transactions in conflict with or in competition with the partnership, even though such acts would normally be deemed breaches of fiduciary duty under § 221 of the Oklahoma UPA, which holds partners accountable as fiduciaries. The court found that in the absence of fraud, illegality or overreaching in the procurement of a written contract, the partners' rights were fixed by contract:[23]

> We find the defendants had a contract right to do precisely what they did, namely, compete with the partners of Josaline and Josaline itself "as if there never had been a partnership." ... Josaline contracted away its right to expect a noncompetitive fiduciary relationship with any of its partners.

*Id.* at 772.

It is reasonable to infer that if a partner may contract away the substantive right to

---

22. Section 218 of the Oklahoma UPA applies in the limited partnership context insofar as a general partner of a limited partnership "shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners ..." 54 Okla. Stat. § 150(a) (1971).

23. *Id.* 634 P.2d at 772, n. 16. Plaintiff attempts to distinguish this case by suggesting that fraud in the procurement of the Partnership Agreement has been alleged. In light of the court's findings *infra* at 34, no such allegations are properly before this court.

expect a fiduciary relationship under Oklahoma law, he or she may also be legally bound by an agreement not to pursue a quasi-procedural right such as an accounting. Case authority under New York law further supports this conclusion.[24] In *Raymond v. Brimberg*, 99 A.D.2d 988, 473 N.Y.S.2d 437 (1st Dep't 1984), a partner moved for a judicial accounting. The court held that he had contracted away this right in the partnership agreement. Significantly, unlike the present case, the partnership agreement at issue did not even contain an explicit waiver of the right to an accounting, but the court nevertheless inferred that "[t]he agreement between the parties effectively established the exclusive procedure for determining the interest of the partners [citation omitted] and thus constitutes a waiver of a judicial accounting." 473 N.Y.S.2d at 439. *See also*, Bromberg and Ribstein, *Partnership* § 6.08(b), p. p 6:98 (1991) (partners may "by their express agreement or conduct, waive their right to a judicial accounting"). Where, as here, a limited partner has *explicitly* waived his right to an accounting, the court must give force to this express agreement and need not even reach the question of whether the parties' conduct designated as exclusive another procedure for valuing the partners' interests.

Policy considerations also persuade the court to enforce the waiver signed by Lenz. Dual concerns underlie the procedural mechanism of an accounting. On one hand, an accounting protects defendant general partners in that it: 1) Prevents limited partners from interfering in the administration of the partnership by comprising the threshold individual direct claim against the general partners, which claim must be prosecuted before limited partners can litigate further individual claims against the general partners; *Ewing*, 441 P.2d 964; Bromberg and Ribstien, *Partnership* § 6.08(b), p. 6:98 (1991) (accounting remedy must be sought before suit to recover damages for mismanagement by general partner); and 2) Protects defendant partners from suit where defendants claims against plaintiff may exceed those sought by the plaintiff. *See e.g., Johnson v. Steward*, Okl., 397 P.2d 907 (1964) ("... an action at law between partners might prove futile absent an accounting because the accounting might reveal that one partner was liable to the other partner in an amount either more or less than he was claiming."); *See also*, 68 C.J.S. *Partnership* § 110, at pp. 552–553 (purpose of rule is to determine whether "plaintiff may be liable to refund even more than he claims in the particular suit"). On the other hand, an accounting protects a plaintiff limited partner by providing access to and information regarding the partnership's books and records, especially in circumstances where the plaintiff has been denied access to those documents or the suit involves "the adjustment of complicated accounts in which an ordinary legal remedy was inadequate." *Fulton v. Baxter*, 596 P.2d 540, 542 (Okla.1979); *see also, Brimberg*, 99 A.D.2d at 989, 473 N.Y.S.2d at 439 (accounting not mandated where plaintiff otherwise obtained adequate access to partnership records).

The instant case does not implicate any of the above policy concerns sufficiently to warrant a finding that plaintiff's waiver of his right to an accounting in the Partnership Agreement violates Oklahoma law and should not be enforced.[25] Defendants are clearly

---

24. *See, infra* for a complete discussion of the appropriateness of relying upon New York case law where, as here, Oklahoma law is unsettled.

25. This specific conclusion differentiates this case from those cited by plaintiff to persuade the court to disregard the waiver. In *Dycus v. Belco Industries, Inc.*, 569 P.2d 553 (Ct.App.Okla. 1977), for example, the court held that a partnership agreement elevating a general partner the same priority as third-party creditors conflicted with § 164 of the Oklahoma Limited Partnership Act, which required that creditors other than general or limited partners have first priority on partnership funds on dissolution. 54 Okla.Stat.

1971, § 164. The Oklahoma Court of Appeals was motivated in its ruling by the policy rationale that, if the contractual provision was allowed to stand, partners could frustrate the rights of third parties by deeming themselves creditors with equal priority. As substantiated below, no policy concerns of like magnitude face the court here. That the policy arguments implicated by a particular set of facts uniquely informs the analysis of whether the contractual provision in question violates statutory prohibitions is confirmed by the *Singer* decision, *supra* at, in which the Oklahoma Court of Appeals concluded that the partnership agreement should govern despite literal conflict with Oklahoma

prepared to move forward absent an accounting and have no claims against plaintiff. Even more, plaintiff's interest in access to materials concerning the Limited Partnership has been fully served here. Although defendants do not dispute their failure to provide plaintiff with some substantial information during the course of the partnership, including certain annual reports specified in the Partnership Agreement, plaintiff has had over two and one-half years to conduct formal discovery proceedings. Prior even to formal discovery, both parties signed a Stipulation and Order in May 1990, providing in relevant part:

> Defendants have agreed to provide plaintiff and his counsel "access" to the corporate and financial books and records of Naples Tennis Resort, Ltd., the limited partnership which is the subject of this action and defendants' records with regard thereto.... "Access" as used herein includes review and photocopying of documents, the opportunity to ask questions and receive answers with regard thereto and is in the nature of an informal accounting.[26]

At no time did plaintiff express dissatisfaction with the access provided to him or the results of formal discovery with respect to any of the transactions or defendants at issue, including the defaulting defendants TFC/Fracorp. In fact, plaintiff asserts by affidavit and in his motion papers that he is prepared to "go to immediate trial" on all of his claims except for this one seeking an accounting. (Lenz Aff., ¶¶ 11, 16–19; Lenz Br. at 5). Plaintiff has simply failed to demonstrate that his waiver cannot be reconciled with the prohibitions of Oklahoma statutes, as they are defined by Oklahoma cases, persuasive decisional authority from New York,

and authoritative scholarship on partnership law. Accordingly, the court denies plaintiff's motion for summary judgment granting an accounting.

## CONCLUSION

For the foregoing reasons, plaintiff's § 10(b) and Rule 10(b)5 claims are dismissed with prejudice as time-barred. Defendants are entitled to summary judgement on plaintiff's remaining state law claims, and they are dismissed. This Order thus disposes of this action in its entirety, and the Clerk of the Court shall enter judgment in favor of the defendants.

SO ORDERED.

---

statute. The cases cited by plaintiff for the proposition that a contractual provision in derogation of statutes cannot be enforced involves compelling policy concerns sufficient to convince the court to interpret the statutory language to be prohibitory. *See e.g., Caward v. State of Oklahoma Dep't of Mines,* 818 P.2d 506 (Okla.Ct.App. 1991) (landowner's waiver of granite pit operator's duty to reclaim land upon cessation of activities was void as violative of public policy goal, codified in Mining Lands Reclamation Act, of protecting natural resources and promoting health, safety and general welfare of Oklahoma

citizens). Case authority for a general proposition does not substitute for a showing that the proposition applies to particular circumstances. Plaintiff has not made such a showing here.

**26.** In light of the finding that the provision of the Partnership Agreement that waives plaintiff's right to an accounting is enforceable, the court does not reach the issue of whether plaintiff's agreement to this "informal accounting" itself constitutes a waiver of the judicial accounting remedy.