Karl THOMPSON, et at., Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

No. 00 Civ. 5071(HB).

United States District Court, S.D. New York.

June 27, 2001.

Regina L. Lapolla, Melvyn I. Weiss, Brad N. Friedman, Barry A. Weprin, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., New York City, John J. Stoia, Jr., Theodore J. Pindar, Jobeth Halper, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., San Diego, CA, Andrew S. Friedman, Bonnett, Fairbourn, Friedman & Balint, P.C., Phoenix, AZ, W. Christian Hoyer, Christa L. Collins, James, Hoyer, Newcomer & Smiljanich, P.A., Tampa, FL, Herman Watson, Jr., Rebekah Keith, Watson, Jimmerson, Givhan & Martin, P.C., Huntsville, AL, Joe Whatley, Charlene P.Cullen, Whatley & Drake, L.L.C., Birmingham, AL, for Plaintiffs.

Colby A. Smith, Bruce E. Yannett, Debevoise & Plimpton, New York City, for Defendant.

## OPINION & ORDER

BAER, District Judge.

Plaintiffs bring this putative class action pursuant to 42 U.S.C. § 1981 and § 1982 seeking redress for what they allege was defendant Metropolitan Life Insurance Company's ("MetLife") pattern of intentional racial discrimination against non-Caucasians in sales of industrial insurance policies from the late 1800s through the 1970s. MetLife has moved for summary judgment arguing that the statute of limitations on these claims has run. Plaintiffs respond that their claims are not time-barred and base their position on three theories: first, that, under the federal accrual rule, the limitations period did not begin to run until the plaintiffs first learned of their injury; second, that the equitable tolling doctrine has tolled the limitations period; and third, that MetLife's activities within the last year constituted a continuing violation that tolled the running of the statute. For the following reasons, defendant's motion must be denied.

## BACKGROUND [1]

The complaint alleges that MetLife sold "industrial" or "burial" insurance policies

---

[1]. The background is intended to provide a snapshot of the facts as they have been presented at this stage of the litigation. However, as discovery is far from complete and the parties have more time in which to move for summary judgment (not to mention the impending motion for class certification) the facts within this section are not intended to constitute findings of fact.

from 1881 into the 1970s.[2] Each of the named plaintiffs [3] in this action is African American and purchased, or had purchased for him or her, a MetLife industrial life insurance policy in the 1940s or 1950s.[4] The hallmark of the industrial life policies was a small face amount with the premiums collected by what where called "debit agents," who came to the policyholder's door to collect premiums either weekly or monthly. The policies were often referred to as "burial" insurance as they were often touted by the insurance agents as providing the funds necessary to afford the policyholder a decent burial and avoiding a financial burden for the policyholders' family.

The "debit agents" were assigned sales territories known as "debit routes." The agent would visit the homes of policyholders living on his debit route and collect the weekly or monthly premiums. This system, and the nature of industrial life insurance generally, facilitated the sale of many policies to the same policyholder since it provided the agent with a new sales opportunity every time he came to the policyholder's door to collect a premium. Furthermore, plaintiffs allege that the frequent visits provided MetLife's agents with an opportunity to develop a personal relationship with the policyholders and thus further enhanced their potential for additional sales, a phenomenon that may have been encouraged by MetLife in its training of sales agents.

One factor that distinguished the industrial insurance policies from MetLife's other policies was the frequent collection of small premium payments. One rationale for these frequent payments was the inability of poorer individuals to pay more than a small weekly or monthly fee for their insurance. However, in practice, the policies appear to have been less than advantageous for the policyholders. In fact, although the payments appeared modest to the policyholder, when the payments were aggregated over a lifetime, it turned out that the industrial life policies were substantially more expensive than other policies sold by MetLife.

Industrial life policyholders paid more over time for these policies and the policies offered fewer benefits and less flexibility than MetLife's other policies, namely Met-Life's "ordinary" life insurance. For example, holders of industrial policies could not apply their dividends to the purchase of increased death benefits nor could they hold the dividends in their accounts to accumulate interest. Instead, the dividends could only be paid to the policyholder as a credit on the premiums owed. Thus, industrial life policyholders were left to purchase additional policies, at additional expense, in order to increase the amount of their life insurance. *See* Tierney Decl. at 6. Furthermore, because industrial policies generally accrue little, if any, cash value, and do not provide increased death benefits, they have little or no value to policyholders until they die. As a conse-

---

**2.** To give some idea of the scope of the sales, the records reflect that of the 2.3 million non-Caucasian policy holders in 1919, over 2 million held the industrial policies, 153,000 held intermediate policies and less than 17,000 held "ordinary" life insurance policies.

**3.** Originally, three groups of plaintiffs brought separate suits against MetLife, all charging violations of § 1981 and § 1982. The three

actions were then consolidated in this Court on consent of the parties.

**4.** Karl Thompson's mother purchased his policy for him in 1943, Lucile Ellis's grandmother purchased her policy for her in 1949; Adrienne Blazio's mother purchased her policy for her in 1954; Marguerite Justin purchased her policy in 1954; and Charlene McCallop purchased her policy in 1942.

quence, policyholders were forced to continue making payments long after their premiums exceeded the face amount of the policy or risk losing all of the premiums they had paid and receiving nothing. Moreover, plaintiffs allege that, although the weekly industrial policies included the cost of weekly collection (and therefore were more expensive than the monthly collection industrial policies), in fact, policyholders lost out even here since frequently the agent failed to collect the premium on a weekly basis. In support of this claim, plaintiff submitted a report detailing the results of a study conducted by the New York State Department of Insurance entitled, "Special Study of Industrial Life Insurance by an Associate Actuary at the New York State Insurance Department," in which the author concluded that:

> An important element in the costly difference in the expense rates between Weekly and Monthly Industrial policies is the difference in collection commissions, which are 12% on weekly policies and 6% on Monthly policies. However, since on average Agents collect nearly a full month's premiums in a single collection from Industrial Weekly policyholders, a serious question exists as to whether the substantial difference in costs between Industrial Weekly and Industrial Monthly policies are equitable. Company files indicate that Agents are instructed to collect more than one week's premium at a time, if possible. One might ask whether it is fair to charge a Weekly premium rate for the monthly collection of premiums.

I.M. Krovidts, Associate Actuary, Special Study of Industrial Life Insurance, New York State Insurance Department, undated, at 117 (Friedman Decl. at I). Thus, it appears that weekly industrial life policyholders were, at least in some cases, charged significantly more *for the same service* provided by the less expensive monthly industrial policies rendering the only advantage of weekly industrial life insurance a nullity.

However, plaintiffs in this action are not here simply to enumerate the ways that industrial life was a bad investment for poor policyholders. Rather, plaintiffs allege that MetLife implemented an even more disturbing practice—targeting African Americans for specific disadvantageous industrial life policies. It appears that a cornerstone of this scheme was MetLife's creation of two tiers of industrial life policies—a standard and a substandard. As the name suggests, the "substandard" version provided the consumer with even less value as the premiums were higher for no additional benefits, and plaintiffs allege that MetLife specifically targeted non-Caucasians for sales of these policies.[5]

Plaintiffs allege that MetLife employed a variety of tactics to steer African American policyholders into these substandard policies or, at least, the weekly collection industrial policies, both of which were significantly more expensive than MetLife's other policies. First, MetLife used the commission-based sales system to limit or even deny commissions to agents who sold to African Americans, thereby resulting in little or no incentive for agents to sell

---

5. MetLife's racial classification system is illustrated by its instruction to its agents in its manual entitled "Instruction Book for Agents," dated June, 1940. There, MetLife advised agents that "[i]n designating race, state the race definitely; for example: White; colored; Indian; Mexican; Hawaiian; Porto Rican (sic); West Indian, etc. Colored includes not only the Negro, but the Mulatto and all other persons having colored blood. Only person of pure Caucasian blood are designated as white; all other races should be designated by their proper term or distinction." Instruction Book for Agents, June, 1940 (Friedman Decl. Ex. LL).

certain policies to African Americans. Put another way, MetLife allegedly limited the commissions paid to agents on all policies sold to non-Caucasians, *except for the sale of weekly industrial policies. See* Untitled Internal MetLife Document, April 17, 1950 (Friedman Decl. Ex. A.). MetLife also limited commissions on industrial weekly policies sold to African Americans that were over a certain face value, thereby preventing African Americans from obtaining a higher amount of insurance without the purchase of an additional policy. *Id.* A MetLife document submitted by the plaintiffs shows that the practice of limiting or eliminating commissions was quite successful and prevented African Americans from purchasing any policy but the weekly industrial policy.[6] The untitled internal MetLife document, dated April 17, 1950, explained MetLife's policy of selectively granting commissions to agents for sales of ordinary life policies for which premiums were not collected on a weekly or monthly basis, (i.e. the more cost-effective policies):

> The commissions paid on policies issued to Negroes are 20%, both first year and renewal, of those paid on policies issued to white persons. This 80% reduction helps to meet the excess mortality. The percentage reduction is approximate in relation to mortality and no claim is made that it does exactly offset the excess mortality. Whether it does or not is academic because of the effect it has on the submission of applications on Negroes. Only about *two tenths of one percent* of our [ordinary non-monthly life

insurance policies] are issued to Negroes.

*Id.* (emphasis added). Thus, MetLife's practice that limited agent commissions for sales of its non-monthly ordinary policies to African–Americans resulted in practically no such sales to this group. MetLife was similarly successful in preventing African Americans from purchasing ordinary and industrial policies for which premiums were collected on a monthly basis. "No first year commission is allowed on [the monthly collection policies] issued to Negroes, but full collection commission will be paid. As a result, almost no such policies are submitted." *Id.* In contrast, MetLife paid agents full commission on the weekly collection industrial policies, the more expensive category of insurance, as long as the face value of the polices was under a certain amount: "Full commissions are allowed on Weekly Industrial policies issued to Negroes, but payment of the commission may be deferred if the Agent writes insurance on Negroes in excess of a specified limit." *Id.* Thus, this policy effectively steered African Americans into the least desirable policies simply be reducing the incentive for agents to sell them the more cost-effective policies.

In addition to manipulating commissions paid to agents, MetLife apparently utilized "occupational underwriting" as a means to ensure that most African–American policyholders purchased the substandard or weekly policies. Plaintiffs allege that the occupational underwriting employed by MetLife was not based on occupational

---

6. The Untitled Internal MetLife Document, dated April 17, 1950, explains in broad terms MetLife's use of incentives to steer African–Americans into less desirable policies: "[O]ur practices can be summarized by saying that race is not taken into account in appraising the applicant, but that it is considered in the payment of commissions." *See* Untitled Internal MetLife Document, dated April 17, 1950 (Friedman Decl. Ex. A). However, in New York State, in which such distinction in commission was illegal, MetLife apparently chose to eschew African–Americans altogether. "In New York State ... the law does not permit us to differentiate in the commissions paid on policies issued to Negroes. Therefore we do not actively canvass for applications on Negroes in New York." *Id.*

hazards, but rather on the racial composition of the workers in a particular profession. A MetLife memorandum entitled "Re: Underwriting Negro Lives," dated December 1945, supports plaintiffs' contention. The memo further describes MetLife's intention to steer most African Americans toward the substandard industrial insurance:

> In addition to adopting the practice of rating applicants on account of low living standards, certain other changes in underwriting procedure appear necessary to ensure that most negro lives and the poorest grade white lives would be automatically assigned to the substandard classifications.

Re: Underwriting Negro Lives, December, 1945 (Friedman Decl. Ex. M). The report then lists the proposed changes recommended to accomplish this goal. The first change refers to the practice of occupational underwriting. Specifically, it contemplates that a higher percentage of African Americans would be in occupations that have a higher (i.e. less desirable) rating, and, therefore, that they would no longer qualify for the standard industrial insurance policies if the underwriting limit was changed to permit less risk. The relevant text reads:

> (a) *Lowering the underwriting limit for standard Industrial insurance from 200% to 150% of standard Ordinary mortality. Since a materially higher proportion of negro lives would be in occupations rates more than +50* and since a higher proportion of negro lives would also be rated more than +50 for reasons other than occupation, the effect of drawing the limit for standard Industrial insurance at 150% *would result in considerably more negro lives than white lives being assigned to the substandard Industrial classification.*

*Id.* (emphasis added). Thus, the report concludes that by lowering the accepted risk level of MetLife's standard policy, and classifying the jobs held by African Americans as higher risk, MetLife would be able to force African Americans into the substandard industrial policies.

Plaintiffs also submitted evidence that MetLife engaged in a similar tactic, i.e. area underwriting, to target African Americans consumers. Specifically, plaintiffs allege that MetLife used area underwriting to identify residential areas that were primarily inhabited by non-Caucasians and that this identification enabled agents to push the substandard industrial policies in these areas, without having to make an explicit reference to the race of an applicant. A internal MetLife document entitled "In re: Special Questions designed to bring out poor environment, moral hazards, and bad habits" by E.A. Lew, dated March 20, 1947, (Friedman Decl. Ex. R.), ("Special Questions Report") evidences MetLife's use of this practice:

> In connection with the proposal now under consideration for the insuring of colored lives, it was agreed (i) to proscribe areas which are clearly substandard by virtue of very poor environmental conditions or moral hazards . . .

Another internal MetLife memorandum entitled "Underwriting By Grade: Manhattan," described how the practice of area underwriting was applied in New York City. This memo and attached map identified 108 areas in Manhattan that had the "least favorable population and housing characteristics" including "the Lower East Side, south of 14th Street; along the West Side, north of 14th Street; in East and Central Harlem; and in the lower parts of Washington Heights." The memo suggests that MetLife was not merely concerned about the economic circumstances of the individuals living in the targeted

areas but was also interested in their race, as the author specifically noted the number of people of color living in the areas. The memo reads, "[a]bout two fifths of the residents in these areas are nonwhite and an additional one fifth are Puerto Rican. This compares with one fourth nonwhite and one eighth Puerto Rican for Manhattan as a whole."  Paul H. Jacobson, Ph.D, Underwriting by Grade: Manhattan, January 15, 1964 (Friedman Decl. at P).  Thus, this memo suggests that, at least in New York, MetLife was concerned with the race of the individuals as a part of its area underwriting, and plaintiffs contend that this practice was much more widespread.

Plaintiffs also allege that MetLife used "mercantile reports" as a means to disqualify African American applicants for all but the lower return policies.  Mercantile reports were prepared by agents based on the responses by applicants to a series of questions.  The specificity of these questions was designed to elicit information from an applicant that would likely have the effect of disqualifying that person for a more cost effective type of insurance.  In the same Special Questions Report referred to above, we read:

> In connection with the proposal now under consideration for the insuring of colored lives, it was agreed . . . (ii) to use special questions designed to bring out poor environmental, moral hazards, or bad habits, either as part of the regular application or perhaps in the form of a special application to be completed in districts where a substantial proportion of the applications are on low grade risks.

The report also provided a number of fact specific questions for agents to ask applicants as a part of this process.  First, it suggested that the agent inquire about the applicant's home environment, including:

(a)  Number of rooms in the home?

(b)  Number of persons living in home, including lodgers?

(c)  Does home contain toilet facilities?

(d)  Does home contain running water?

(e)  Is home in good repair?

(f)  Is home clean?

*Id.* The report also proposed questions for agents to ask about an applicant's "habits and morals."  These included:

(a)  Does applicant or premium-payer associate with criminals or gamblers such as those in the policy number game?

(b)  Does the applicant or the premium-payer get into fights?

(c)  Have the applicant's or the premium-payer's drinking habits been criticized?

(d)  Is there any other criticism of the applicant's or premium-payer's habits or reputation?

The report noted that neither set of questions would be appropriate to add to the standard application as the questions were "too detailed and otherwise unsuitable."  Instead, the report suggested the creation of a "special application" that would contain these detailed questions.  The report makes clear that the "special application" is designed to elicit answers that would serve as grounds for refusing insurance to an applicant:

> A special application which asks a fairly large number of plain spoken definite questions regarding poor home environment and questionable morals or habits is more likely to elicit an answer on the basis of which the case may be declined, than would a few question, necessarily somewhat generalized, on the regular application.  Furthermore, the intent of questions of the type suggested for the special application should soon become obvious to the agent.

*Id.* This report, therefore, strongly suggests that MetLife intended for agents to use its "special application" to weed out African American applicants, while the company considered the questions inappropriate for the standard application, which would presumably be used for Caucasian applicants. An, undated, MetLife internal chart entitled "Outline Showing How Applications Are to be Handled Industrial and Ordinary—All Offices," bolsters this conclusion as it shows that MetLife required mercantile reports for all African American applicants, but not for Caucasian applicants. *See* Friedman Decl. Ex. JJ. According to this chart, agents were required to complete mercantile reports for all African American applicants for ordinary life policies. The chart also shows that MetLife required its agents to complete mercantile reports for African American applicants for some types of industrial insurance as well, although the chart does not specify which types of industrial insurance were included. *Id.* Thus, this chart shows that MetLife required agents to obtain mercantile reports for African Americans seeking "ordinary" life insurance, the far superior policy, as well as for some types (presumably the more favorable) of industrial policies.

Plaintiffs have also provided evidence in the form of an internal MetLife report entitled "Re: Controls on Volume and Quality of Colored Business" that shows that MetLife implemented strategies designed to reduce the "volume and quality" of policies held by African American policyholders. The report listed proposed "controls" that MetLife could institute with respect to African American applicants to effect the amount of African American business by either preventing African Americans from qualifying for a policy altogether or routing them to the less desirable, lower value, policies. The list included:

(a) Limit on amount issued (insurance or premium or both)—say $500 in 12 months[, i.e. a cap on the face value of the policy].

(b) Place limit on total Industrial (insurance or premiums or both) allowed on one life—say a total limit of $1,000 Industrial insurance (weekly and monthly combined) . . .

(e) Make free use of medical examinations.

(f) Obtain mercantile reports on all non-medical cases—might modify form of report to bring out living standards, health history, etc. in more detail.

(g) In the post-issue inspections by Home Office inspectors, concentrate on colored.

(h) Obtain supplementary questionnaires on housing, sanitation, environment, etc. Could be used in certain cases or in all cases.

Controls on Volume and Quality of Colored Business, undated (Friedman Decl. Ex. T). Thus, this report provides further support for MetLife's practice of applying additional screening to African American applicants in order to refuse to insure them or to steer them into higher cost policies.

The effect of the above described practices of steering African Americans to "substandard" policies can be illustrated by a comparison of the policy held by plaintiff Thompson with the other policies sold by MetLife. Thompson's mother purchased a "substandard" weekly industrial policy in his name in 1943. The premiums were $.10 a week ($5.20 per year) to be paid for over 30 years and the maximum death benefit to be paid was $178.00. When Thompson's premiums were paid up, he (and/or his mother) had spent $156 for a policy with a face value of $178.00, this of course excludes interest and dividends all of which went to MetLife's coffers. How-

ever, if Thompson had been sold the standard, rather than the substandard, weekly industrial policy, he would have paid a total of $112.80 for $178 of insurance, a difference of $44. The difference becomes even more stark when one considers the monthly industrial insurance policy rates. With a monthly policy, Thompson would have paid $97.58 for his $178 of death benefit—a $61 difference. Finally, a monthly ordinary (i.e. non-industrial) policyholder would have made payments totaling $81.80 over the life of the policy for $178 in death benefits, $75 less than Thompson paid. Thus, Thompson paid almost twice as much as the holder of an ordinary policy would have paid for the same death benefits. *See* Tierney Decl. at 3–4.

Finally, it must be noted that much of the evidence submitted indicates that MetLife's efforts to assign African Americans to substandard policies was premised on the belief that African Americans had a higher mortality rate than Caucasians. Although plaintiffs allege that the actuarial tables that support this conclusion were flawed, it is impossible to draw any conclusions on this score at this early stage. Whether the data on which MetLife relied was sound or not, MetLife's documents reflect its apparent concern that white policyholders would be prejudiced by higher insurance rates if they were sold the same type of insurance as blacks.

> Since the laws of several states do not permit us to take race into account in appraising an applicant for insurance, we have had to adopt other means of avoiding unfair discrimination against white policyholders in the cost of their insurance.

Untitled Internal MetLife Document, April 17, 1950 (Friedman Decl. Ex. A.). At the same time, however, it is also clear that MetLife was aware that drawing broad-

racial categories was overinclusive and would result in some African Americans being penalized merely because of their race:

> [M]any studies have been made with respect to the mortality among Negroes and all have shown that, class for class, their mortality is higher than that of white persons. It is not true, of course, that all Negroes have higher mortality than any white persons because Negro physicians would undoubtedly show up better than white underground miners. The important fact that needs to be emphasized is that Negroes have higher mortality than white persons of the corresponding class.

Untitled Internal MetLife document, April 17, 1950 (Friedman Decl. Ex. A.). Yet despite this statement, plaintiffs allege, and the evidence at this early stage suggests, that MetLife applied a broad brush to its categorization of African Americans, resulting in the sale of high-cost, low-benefit policies to millions of African Americans.

## DISCUSSION

Defendant has moved for summary judgment dismissing plaintiffs' claims on the ground that, because plaintiffs purchased their policies over fifty years ago, their claims are time barred. Plaintiffs respond that the statute of limitations does not bar their claims since: 1) under the federal accrual rule, the statute of limitations did not begin to run until recently; 2) the equitable tolling doctrine tolled the statute; and 3) MetLife's continuing violations have maintained the cause of action. I find that plaintiffs' claims are not time barred based on an application of the federal accrual rule, consequently I will consider the second and third grounds in only a cursory fashion.

## I. Standard of Review

A motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Furthermore, the court must "draw all factual inferences in favor of the party against whom summary judgment is sought." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995). On the other hand, a party opposing a motion for summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. The Federal Accrual Rule

■ MetLife charges that the plaintiffs should have known, using reasonable diligence, that they had been injured by the sales of substandard life insurance on the basis of the public record of MetLife's practices, including various articles, books, admissions by MetLife, two prior lawsuits, and of the "social realities" of the time. In response, plaintiffs contend that these things were insufficient to show that plaintiff knew or should have known of their injury.

Under federal law, an action normally accrues at the time of injury. *See Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir.1998). However, as with most other rules, there are exceptions. Specifically, "where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies." *Id.; see also Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir.1980), cert. denied, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981) (holding that the time of accrual of a federal civil rights claim under Sections 1981 and 1982 is the "point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action."). Under this rubric, "accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury and its cause." *Corcoran v. New York Power Auth.*, 202 F.3d 530, 544 (2d Cir.1999) (citing *Kronisch*, 150 F.3d at 121). As the Second Circuit explained in *Kronisch*,

> [d]iscovery of the "critical facts" of injury and causation is not an exacting requirement, but requires only knowledge of, or knowledge that could lead to, the basic facts of the injury ... [A] claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice. A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence.

150 F.3d at 121 (citations omitted). In this way, courts have made clear that it is not necessary for a plaintiff to understand every permutation of his or her injury, rather the plaintiff simply needs to have a "hint" or "suspicion" of the injury and its cause to be put on inquiry notice.

■ Here, the named plaintiffs all testified at deposition that, until recently, they had no actual knowledge of MetLife's alleged practices or that they may have in-

curred any injury due to the defendant's policies. Therefore, the key issue is whether the evidence submitted by the defendant allows me to conclude, as a matter of law, that the plaintiffs were put on inquiry notice of their injuries, in other words whether they "should have known" of evidence that would allow them to discover the injury that they may have suffered from being sold a discriminatory, substandard policy, or does a question of fact remain so that summary judgment must be denied. To do this I must meld two concepts, first did the plaintiff exercise "reasonable diligence," i.e. would a reasonable person have discovered the injury, and, second, the fact that the policyholders targeted by MetLife for the sale of its industrial policies, including the plaintiffs here, were relatively unsophisticated and economically disadvantaged.[7] *See Tab P'ship v. Grantland Fin. Corp.*, 866 F.Supp. 807, 811 n. 3 (S.D.N.Y.1994) ("It is well settled that a court may consider the sophistication of a plaintiff investor in evaluating issues of inquiry notice, fraudulent concealment, and constructive knowledge because an investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced that investor to inquire into the likelihood of fraud involving his or her investment."); *Lenz v. Associated Inns and Rest. Co. of Am.*, 833 F.Supp.

362, 375 (S.D.N.Y.1993) ("The sophistication of the investor ... is extremely relevant, because the investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced the investor to undertake an inquiry.").

A word about the burden of proof, although the plaintiffs ultimately bear the burden of proving that their claims fall within this "exception" to the statute of limitations,[8] at this stage of the litigation, the burden, as in any summary judgment motion, falls squarely on the defendant to show that there is no material issue of fact. *See In re Integrated Res.*, 815 F.Supp. 620, (S.D.N.Y.1993) ("[w]hen inquiry notice is asserted by a defendant as the basis for a summary judgment motion ... the defendant has the burden of showing that no genuine issue of material fact exists as to whether the plaintiff, exercising reasonable diligence, would have discovered the fraudulent scheme ..."). Recent cases in this court have highlighted the extent of the defendant's burden at this stage of the litigation,[9] describing it as "extraordinary" and positing that summary judgment is appropriate only in "extreme circumstances." *In re Prudential Sec. Inc.*, 930 F.Supp. 68, 75 (S.D.N.Y. 1996). Courts are equally clear, however, that summary judgment *is* appropriate

---

7. Most of the named plaintiffs did not finish high school and worked in relatively low paying jobs. For example, Lucille Ellis left high school in the 10th grade and worked for 27 years in a hospital cafeteria. Marguerite Justin left school in the 11th grade and worked in a clothing factory. She lived on the same street her whole life and traveled outside of her home state of Louisiana only after she retired.

8. It is clear that the plaintiff bears the burden of proving that these facts at trial. *See Freschi v. Grand Coal Venture*, 767 F.2d 1041 (2d Cir.1985) (holding that the district court erred

in instructing the jury that the burden of proving plaintiffs' constructive knowledge was on the defendant).

9. The determination of whether a plaintiff was put on "inquiry notice" of his or her claim is clearly a question of fact. *See In re Integrated Resources*, 815 F.Supp. at 638 ("This Court has noted the care with which a motion for summary judgment based on an assertion of inquiry notice must be decided, because the question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide.").

when there is no issue of fact. Thus, at the end of the day, the court in *In re Integrated Resources* granted defendant's motion for summary judgment while it emphasized the care courts must take in similar scenarios. *See In re Integrated Res.*, 815 F.Supp. at 638–39.

With these legal standards in place, juxtaposed with all the evidence presented by the defendant, this Court cannot conclusively find that plaintiffs, exercising reasonable diligence, did or should have had notice of their injury.[10] Defendant has undoubtedly engaged in an extensive search to uncover evidence of general public awareness of the discriminatory conduct associated with industrial life insurance policies. As a result, I have in front of me numerous documents that clearly show that some people were aware of the inequities of industrial life insurance policies and of the fact that these policies were discriminatory. The trick is to determine whether, as a matter of law, these sources—including media coverage, scholarly and industry publications, court records and government reports—demonstrate that a reasonable person in plaintiff's shoes was or should have been put on inquiry notice of their injury. Defendant is careful to note that it is not alleging that any of the plaintiffs actually read any of these documents. Rather, MetLife contends that the articles cumulatively "reflect" a general public awareness of the realities of industrial life insurance.

Many of the cited newspaper and magazine articles are indictments of the insurance industry. Several of the articles describe the advent and success of black owned insurance companies and comment on the problems that African Americans faced in obtaining insurance from "white" insurance companies. The following excerpt is representative, "Born of necessity because White managed companies either refused to insure Blacks or did so at highly discriminatory premium rates, the life insurance industry continues to represent one of the few outstanding examples of Black enterprise and progress." Edward D. Davis, *Black Insurance Companies and Their Role in the Development of Blacks*, New York Amsterdam News, Summer 1976, at C5. Some newspaper and magazine articles focused directly on what the authors believed to be the wrongs perpetrated by the insurance industry: "Debit Life Insurance, sold door-to-door and paid monthly or weekly in small amounts, is victimizing the poor and undereducated with high prices for scanty coverage, a Federal Trade Commission study says." *FTC Study Raps Insurance*, Chicago Defender, February 1, 1979, at 6. Articles in another periodical appear designed to expose the realities of industrial life insurance (including discrimination against African Americans) based on the experience of one former sales representative who "discovered" [11] that he was "ripping-off" certain policyholders by selling them industrial policies,

10. Significantly, this case is different from many others in which the courts granted summary judgment. There, the issue was whether the plaintiff had been put on inquiry notice by facts that he or she undisputably knew. *See Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir.1998); *Lenz v. Associated Inns and Restaurants Co. of Am.*, 833 F.Supp. 362 (S.D.N.Y.1993); *In re Integrated Resources*, 815 F.Supp. 620 (S.D.N.Y.1993). Here, the question is whether, if the plaintiffs had exercised a reasonable level of diligence, any evidence of their injury would have reached them.

11. It is worth noting that if, in 1980, a sales representative, presumably familiar with the insurance business, had to "discover" the inequities of industrial life insurance that it was unlikely to have been common knowledge among poor, economically disadvantaged policyholders.

Moulton explained that not only do these agencies cheat the poor, they have a prejudicial system within the companies that hinders blacks from getting an adequate policy. Moulton said that many companies such as Citizens Home have two different classes of applicants—the preferred class and the regular class. *See* Derek T. Dingle, *Insurance Schemes Still Plague Poor,* Norfolk Journal & Guide, June 18, 1980, at 1. Still other articles attempted to explain the differential treatment between African American and Caucasian premium rates by attributing the increased costs of insurance to their higher mortality rate, "Flourishing on the fact that big, white life companies discriminate against black risks because of the higher mortality rate among Negros, the Negro insurance company has, on the whole, had a sorry record." *Victory,* Time Magazine, March 23, 1936, at 70; *see also* Albert Edward Wiggam, *Let's Explore Your Mind,* The Detroit News, September 26, 1936 at 10 ("It is arithmetic not race prejudice that makes life insurance higher for Negros."). Other articles described the discriminatory practice of refusing to insure African–Americans: "In 1940 . . . a majority of white insurance companies did not actively seek black policyholders". Forty-two percent said, "Negroes are not acceptable," and 22 percent revealed that "Negroes are not solicited." See Winfred Bryson, *Insurance Companies: An Overview,* Black Enterprise, June 1977, at 121–122. Defendant's evidence also included a few articles from nationally circulated periodicals, such as the Wall Street Journal. The Journal reported, in 1988, on an agreement by several insurance companies to make reparations to African American policyholders for past discriminatory tactics, the article read: "Under the agreement, the insurers will correct past discrimination against black policy holders by increasing benefits available to their bene-ficiaries at death. The companies stopped selling the discriminatory policies more than 20 years ago, but continued to collect race-based premiums on policies that had already been sold." See Paul M. Barrett, *Delaware Settles Insurance Complaints on Blacks' Policies With Five Firms,* The Wall Street Journal, August 26, 1988.

While these twenty-four articles, published over a sixty year period, could be construed as reflecting a general public awareness of the inequities of industrial life insurance, the defendant's evidence is a far cry from what is necessary to determine, as a matter of law, that these plaintiff's should have known of their injuries.

MetLife also relies on a telecast of 60 Minutes that aired in 1979. There, one of the three featured segments, entitled "Soak the Poor," focused on the exploitative nature of industrial life insurance. In the story, Mike Wallace described industrial insurance as "poor person's insurance" and "some of the most expensive insurance available anyplace." At one point, Wallace commented on the disparate impact on African American policy holders in a discussion with an insurance agent who sold industrial insurance to the poor.

> Wallace: But you will agree that industrial insurance is kind of a rip-off
>
> [Agent]: Yes.
>
> Wallace:—of poor folks, and mostly black folks?
>
> [Agent]: Not necessarily black. We have many white policyholders that have it too.
>
> Wallace: I simply said mostly black folks.
>
> [Agent]: In my area it's mostly black folks . . .

Interestingly, this program cuts both ways. One the one hand, this is a national program that could have alerted policyholders to their injury. But, on the other

hand, the fact that 60 Minutes viewed this story as newsworthy suggests that at least, at that time, that it was the general belief that the facts surrounding industrial insurance and its targets were little known. A reasonable inference from the episode, viewed in its entirety, simply suggests that blacks were affected more by industrial insurance because more blacks were poor.

MetLife also points to two lawsuits, one in 1935 and the other in 1976, as evidence that a "reasonably diligent plaintiff long ago could have learned about and pursued exactly the types of claims these plaintiffs now seek to pursue." [12] Although the fact that two individuals, out of the millions that were sold policies, brought a claim against MetLife on this ground is again evidence that some people knew of the unequal nature of the policies, but this cannot be my yardstick for a determination that the plaintiffs here, or other reasonable persons, knew or should have known of their injuries. [13]

MetLife also relies on evidence that certain members of the NAACP were aware of MetLife's practices as evidence that plaintiffs should have known of their injury or that because select NAACP officials, whose raison d'etre was to stamp out discrimination against African Americans, knew of or suspected MetLife's alleged discriminatory tactics, the general community (or at least the black community) somehow knew of it as well. Casting a somewhat broader net, MetLife contends that the "realities" of the time should have put plaintiffs on notice of their injury. Specifically, defendant argues that "America was a segregated society when plaintiffs' policies were purchased and that in such a society, plaintiffs knew or should have known that they were unlikely to receive the same treatment as Caucasians." Df's Reply at 8. I find this argument troubling. Segregation and discrimination generally are complex social phenomena, and to suggest that all "reasonable" African–Americans knew or should have known that they would be discriminated against by every company with which they did business is at best farfetched and probably untrue. [14] In any event, defendant will have adequate opportunity to posit such an argument, perhaps even eventually to a jury, who may or may not share its view. [15]

---

**12.** Here MetLife relies upon the incorrect legal standard. The test is not whether a plaintiff "could have learned" of their injury, but rather whether with the application of reasonable diligence, the plaintiff's here should have known (or been put on inquiry notice of) their injury.

**13.** The cases that defendant relies on for the proposition that these other lawsuits should have put the plaintiffs on notice are inapposite. In *Arneil v. Ramsey*, 550 F.2d 774, 781 (2d Cir.1977), the court concluded that the plaintiffs were put on inquiry notice due to the public admission of "willful securities laws violations," the public description of one of the entities as "in peril," and its subsequent bankruptcy. The court concluded that "investors of the scale and experience of these plaintiffs should have been put on notice to look deeper." *Id.* Likewise, in *Berry Petrole-*

*um v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975), the court was easily able to conclude that "other facts alleged in [plaintiffs] own complaint which they must have known prior to December 15, 1969, should have put them on notice" including the fact that the stock price had dropped precariously, that the SEC entered a consent order, which was widely publicized in the financial press, and that other shareholders had filed suit *Id.* The crucial distinction in our case is the lack of evidence of the initial tip-off of the policyholders.

**14.** This is reflected by the plaintiffs respective testimony about discrimination they encountered over the course of their lives.

**15.** MetLife also argues that the following facts should have suggested to plaintiffs that MetLife was engaged in such practices: the appli-

In a separate tact, defendant argues, not unconvincingly, that this is a case in which the policies behind the statute of limitations have particular significance, and are sufficient to bar the claims. MetLife points to the fact that many of its executives and agents selling the policies have retired or passed away, that much of the documentary evidence from the relevant time period has been lost, and that peoples memories have faded. Clearly these considerations are pertinent to any consideration of this statute of limitations, *see United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), however it is equally clear that the "exceptions" to the statute exist for a reason. The diligence-discovery prong of the federal accrual rule in particular protects those who, reasonably, were unaware that they had even suffered an injury. While this case may present difficulties of proof because of the significant passage of time between the sales of the policies and the commencement of the action, it is impossible at this stage to conclude that there is insufficient evidence on either side to proceed. And, as compelling as the policies behind the statute of limitations may be, they do not eclipse the wisdom of tolling it when, as here, it appears that the plaintiffs, using reasonable diligence, i.e. the diligence that was reasonable given their social and economic circumstances, may have never learned of their injuries.[16]

Taken together, all of the evidence creates a material issue of fact as to whether the plaintiffs were or should have been on notice of their injury years ago that cannot be resolved at this stage of the litigation.

## II. Equitable Tolling

■ Plaintiffs also argue that their claims are not barred by the statute of limitations under the "equitable tolling" doctrine. "The essence of the doctrine [of equitable tolling] is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action." *Cerbone v. Int'l Ladies Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir.1985). In order to prevail on an equitable tolling theory, plaintiffs must show that they were not aware of their claim either because the nature of the defendant's conduct was "self-concealing" or because the defendant affirmatively acted to prevent plaintiff from discovering the conduct. Plaintiffs must also show that the concealment prevented their discovery of the claims within the limitations period and that they exercised due diligence in investigating their rights. *See Cerbone*, 768 F.2d at 48–49; *State of New York v. Hendrickson Bros. Inc.*, 840 F.2d 1065, 1083 (2d Cir.1988).

■ Here, I have concluded that plaintiffs have raised a material issue of fact insofar as injury awareness is concerned, it is difficult then to conclude that they had an opportunity to know that they had a cause of action against the defendant. However, assuming that a hypothetical plaintiff did have knowledge, or constructive knowledge, of injury, the defendant failed to show, as a matter of law, that the statute of limitations is not tolled on this

---

cation form asked for the applicant's race; that most life insurance companies would not do business with African–Americans; and that Met Life sold other forms of insurance. *See* Dfs Reply at 11–12. Once again, although this may assist MetLife in its argument that a reasonable person should have known of the inequities with the policies, it does not pro-

vide conclusive evidence that allows me to rule as a matter of law.

16. Defendant was unable to cite any cases in which a court has disregarded a well-established "exception" to the normal statute of limitations rules on the basis of policy concerns or practical difficulties.

ground as well. Specifically, plaintiffs have put forth several ways in which they claim that the defendant purposefully acted to conceal its conduct.[17] Although defendant disputes plaintiffs' claims, and contends that the knowledge of the cause of action was so out in the open that plaintiffs cannot rely on this argument, I am unable to find as a matter of law that plaintiffs arguments do not have merit.[18] Furthermore, given the fact that plaintiffs may have been completely unaware of the cause of action (not to mention their injury), I find that there are also a material issues of fact as to whether the plaintiffs were prevented from discovering their claims and whether they were diligent in investigating their rights.

17. Plaintiffs allege that MetLife has engaged in many affirmative acts designed to conceal the cause of action, including the following: in 1928, telling the NAACP that it was taking steps to increase the amount of ordinary life insurance carried by African–Americans when in fact the company decreased these sales; responding to New York's anti-discrimination laws in 1935 by reducing the commissions to sales agents for sales to non-Caucasians; in 1947, implementing a program to "equalize" the substandard policies sold to non-Caucasians with those sold to Caucasians and attributing this change to improved mortality rates among non-Caucasians, rather than admitting that the change was due to fear of discrimination suits; announcing the elimination of the higher substandard premium rates that it had been charging for policies sold to non-Caucasians while secretly it adopted policies designed to limit the volume of business with non-Caucasians; requiring agents to obtain additional information in the form of medical reports, mercantile reports or supplemental questionnaires for all non-Caucasians in order to classify them in a higher risk category but reporting to public agencies that it employed "non-discriminatory underwriting practices;" assigning certain low-risk occupations that were held primarily by non-Caucasians to higher rates; and implementing "area-underwriting" when it was no longer able, due to new laws passed in New York, to ask applicants their race.

## III. Continuing Violations Doctrine

Plaintiffs also contend that "MetLife has never ceased discriminating against non-Caucasians," and therefore that the continuing violations doctrine tolled the statute of limitations period. The continuing violations doctrine tolls the running of the statute of limitations on all discriminatory acts until the defendant has taken its last act in furtherance of its discriminatory practice. *See Connecticut Light & Power Co. v. Secretary of U.S. Dept. of Labor,* 85 F.3d 89, 96 (2d Cir. 1996). "There is indeed a 'continuing violation' exception to the normal knew-or-should-have-known accrual date of a discrimination claim when "there is evidence of an ongoing discriminatory policy or

18. I also decline to find as a matter of law that defendant's conduct was not self-concealing. The law on whether conduct is "self-concealing" is not crystal clear. Defendant argues that conduct is "self-concealing" only where the underlying wrong *must* be hidden in order for it to be accomplished, such as in the case of wiretapping or anti-competitive conspiracies. *See New York v. Hendrickson Bros. Inc.,* 840 F.2d 1065, 1083 (2d Cir.1988) ("[T]he plaintiff may prove the concealment element by showing ... that the wrong itself was of such a nature as to be self-concealing. The passing off of a sham article as one that is genuine is an inherently self-concealing fraud, whether what is passed off is a fake vase sold as a real antique ... or a collusive bid purporting to reflect genuine competition."). However, the cases are not clear that self-concealment could not apply here, where, as plaintiffs allege, the plaintiffs were relatively disadvantaged, did not have a point of comparison to other policies (i.e. agents did not tell them they were not getting the best deal), did not have publicity or public records to put them on notice of their claim, and may not have purchased the policies if they knew they were being exploited. *See Weil v. Long Island Sav. Bank, FSB,* 77 F.Supp.2d 313 (E.D.N.Y. 1999) (holding that a fraud in violation of TILA was self-concealing).

practice, such as use of discriminatory seniority lists or employment tests." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996). Here, where the plaintiffs allege a violation of the civil rights act, an act can only constitute a continuing violation if the act was performed with a discriminatory intent. *See Harris v. City of New York,* 186 F.3d 243, 249 (2d Cir.1999).

██ The issue then is whether the recent conduct cited by plaintiffs constitutes further acts of discrimination or merely "residual effects" of past discrimination, including: allocation and distribution of fewer shares of stock to non-Caucasian policyholders than to Caucasian policy holders when the defendant demutualized last year, distributing dividends on policies owned by non-Caucasians that were less favorable than dividends paid on policies owned by Caucasians, and collecting discriminatory premiums from non-Caucasians and the paying to non-Caucasians of lower benefits.

While perhaps the weakest string to their bow, given the fact that discovery is apparently far from completed, it is inappropriate now to decide this issue, particularly since it is unnecessary for the purposes of this motion.

## CONCLUSION

For the above reasons, I find that defendants have failed to meet their burden of showing that there are no material issues of fact as to whether the statute of limitations bars plaintiffs claims, and the motion is denied. Fully briefed class certification motions must be submitted to the Court no later than August 17, 2001.